**RAÚL R. LABRADOR**
**ATTORNEY GENERAL**

**MICHAEL J. KANE**
**SPECIAL DEPUTY ATTORNEY GENERAL**
**MICHAEL KANE & ASSOCIATES, PLLC**
702 W. Idaho St., Suite 1100
Post Office Box 2865 (83701)
Boise, Idaho 83702
Telephone:  (208) 342-4545
Email:  mkane@ktlaw.net
Idaho State Bar No. 2652

ATTORNEYS FOR IDAHO STATE DEFENDANTS
        (MIGUEL RIVERA, JR.)

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| ESTATE OF ROBERT THOMAS SEQUINTS, by and through its personal representative, XAVIER T. SEQUINTS; S.S., D.S., and J.S., minor children, by and through their guardian BRENT SEQUINTS, SR.; and BRENT SEQUINTS, SR., | ) ) ) ) ) ) ) | Case No. 1:24-cv-00271-DKG |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | REPLY BRIEF IN SUPPORT OF |
| MIGUEL RIVERA, JR., in his individual capacity; IDAHO STATE POLICE, an Administrative Agency of the State of Idaho; STEVEN DAVIS and MATT SMITH, in their individual capacities; and JOHN/JANE DOES 1-10, other law enforcement officers whose true names are unknown, in their individual capacities, | ) ) ) ) ) ) ) ) ) | DEFENDANT MIGUEL RIVERA, JR.'S MOTION FOR SUMMARY JUDGMENT (Dkt. 28) |
| Defendant. | ) ) ) | |

COMES NOW Defendant Miguel Rivera, Jr., by and through his attorney of record, Michael J. Kane, of the firm Michael Kane and Associates, PLLC, and hereby submits the following Reply Brief in support of Defendant Miguel Rivera, Jr.'s Motion for Summary Judgment.

## I.    Lack of Standing

Plaintiffs begin by asserting that there was not a termination of parental rights, merely a guardianship. Without a shred of admissible supporting proof, they claim that Robert Sequints ("Robert") was participating in reunification proceedings in tribal court. The permanent guardianship gave full parental right of control for the entire childhood of each child to Brent Sequints. Plaintiffs ignore that this permanent guardianship had been in place for several years before Robert died and that Robert had not lived with the children for most of that time, and they further ignore that he did not financially support them in any way – ever. Plaintiffs also ignore that the permanent guardianship was filed during the pendency of child protective proceedings brought by the tribal authorities and operated in lieu of those proceedings.

There can be no doubt that the legal rights of parenthood were severed in this case, but, more to the point, no real effort by Robert to support the children or act as a true parent ever occurred. The crux of Defendant's briefing was that much more is required to establish standing than claims of family ties to the deceased. Under Idaho law, no claim as an heir of a putative father can occur unless there is proof of support and services. When asked to provide proof of support or services, Plaintiffs flatly stated they had nothing to give. The major case on this subject, which is not about adoption as Plaintiff's claim, but is about standing under § 1983, states:

> Judicially enforceable Fourteenth Amendment interests require enduring relationships reflecting an assumption of parental responsibility and "stem from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in promoting a way of life through the instruction of children."

*Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1058 (9th Cir. 2018).  Occasionally taking a child to school or sometimes living in the same household with the children does not establish assumption of parental responsibility.

## II.    Taser Use and the Fourth Amendment

Plaintiffs assert that Rivera told "two different stories" about what happened.  In fact, the written statement from Mr. Rivera and his deposition are consistent. Nowhere in the written statement is an assertion as to the exact location the tasing took place, nor does it state that Mr. Rivera "chased" Robert into a freeway lane.  Attempting to assert that Robert's placing himself on the center line of the freeway was an involuntary act – "fell" as opposed to "lay down" – is arguing about something Mr. Rivera could not know.  What is relevant is that Robert refused to get up, claiming he had been shot.  In other words, he could get up, move to the center lane, speak, lift his head to look back at traffic.  This demonstrates he was not disabled by the taser burst after five seconds.

Plaintiffs assert that some taser use can be deadly, citing *Jones v. Las Vegas Metro. Police Dep't*, 873 F.3d 1123, 1131 (9th Cir. 2017).  Plaintiffs then assert that the injury caused by the taser in this case was death, despite that Robert indisputably did not die as a direct result of the single taser burst by Rivera.

The *Jones* case was about a fleeing suspect who died directly from "continuous, repeated and simultaneous tasings" by two officers over a period of 90 seconds.  What *Jones* in fact stated was that use of a taser as described above was different from isolated taser shock situations.  *Id* at 1131.  For example, three five-second taser bursts used on a resisting person was not excessive force. "We explained that taser use in that case was "less than ... intermediate" force because it was 'more on par with pain compliance techniques.'"  *Jones* at 1131, citing *Brooks* v. *City of Seattle*, 599 F.3d 1018 (9th Cir. 2010).  Hence, to assert that the law states that use of a single taser

burst is deadly force against a subject closing in a fighting stance is wholly without basis.  The law is precisely the opposite of what Plaintiffs assert.

Plaintiffs cite *Faison v. Knea*, 2025 WL 3685198, at *11 (N.D. Cal. Dec. 18, 2025), for the proposition that location can be considered as to whether force is considered deadly.  *Faison* was about a fleeing suspect who was tased in a river and drowned. The cases cited therein also involved tasings of fleeing suspects, one leading officers on a rooftop chase, the other scaling a wall.  These cases have no bearing on a situation where a tasing occurs against a person actively aggressing an officer.  Police have a right to defend against aggression no matter where they are, but especially if they themselves are in a dangerous location.  Put another way, the location of the use of a taser is only relevant when an officer has time to ruminate on whether he should place a fleeing suspect in unnecessary danger.  When a rapidly unfolding event requires an officer to defend himself, the location is not relevant to the constitutional analysis.   In a case where a resisting subject was fighting the officer, a court found:

> "Police officers are entitled to employ reasonable methods to protect themselves and others in potentially dangerous situations." *Allen v. City of Los Angeles,* 66 F.3d at 1056. Under the circumstances presented, it was objectively reasonable to use a less-than-intermediate level of force to subdue Plaintiff and prevent him from injuring the officers.

*Ciampi v. City of Palo Alto*, 790 F. Supp. 2d 1077, 1104 (N.D. Cal. 2011).   Police officers also "need not avail themselves of the least intrusive means of responding to an exigent situation." *Scott v. Henrich,* 39 F.3d 912, 915 (9th Cir.1994), *cert. denied,* 515 U.S. 1159 (1995).

Plaintiffs attempt to parse the difference between Robert's conduct when Rivera first arrived (lying in the grass) from what later happened, suggesting there was no crime, and hence no reason to deploy the taser.  This argument must fail because once Robert closed with Rivera in a fighting stance, there was at least an assault, if not felony assault on an officer.

Plaintiffs assert that Robert never assaulted the officer, claiming that Sequints is never heard making any threats on the audio and Rivera does not claim that Sequints ever attempted to strike or kick him.  This is a meritless assertion given the audio demonstrating that the taser was deployed immediately after Rivera shouted "Get away from me" twice.

Plaintiffs assert that there were "many" alternatives to tasing Robert, including establishing traffic control and putting on a vest, or simply doing nothing since there was no other officer present, or developing a plan of some kind.  These assertions are meaningless in the context of an instantly aggressive subject closing with Rivera.

Plaintiffs assert that State Police policy was violated in that the taser was used without another officer present, or that Rivera had not developed a "plan" prior to tasing Robert. Plaintiffs state the policy "required" this.  In fact, the policy used the word "should" as opposed to "shall." Moreover, it is recognized in State Police policy that "troopers who fail to use force when warranted may endanger themselves, the community and fellow troopers" (Dkt. 35-17, page 1), and, "Troopers may also use any other reasonable force necessary to gain control of a situation provided authorized techniques are not available or practical." (Dkt. 35-17, page 3).  In other words, policies go out the window in the face of real events that make the policy irrelevant. In any event, purported violation of a policy does not legally equate to a violation of the Constitution or that unconstitutional excessive force occurred in a given situation.  *Cousins v. Lockyer*, 568 F.3d 1063, 1070 (9th Cir. 2009);  *Elifritz v. Fender,* 460 F. Supp. 3d 1088, 1112 (D. Or. 2020).

Plaintiffs assert that Rivera "funnelled" traffic over Robert.  They cite Rivera's deposition by page numbers for this proposition.  Rivera simply did not say anything like that at his deposition.  This accusation is an invention of Plaintiffs.  What Rivera did say was that he was attempting to get Robert back on the median, and even put himself in harm's way in that attempt.  Having said that, this is not a negligence case.  This is a case where the allegation is

unconstitutional excessive force by use of a taser. Any assertion that Rivera could have done something other than what he did <u>after</u> the tasing is irrelevant to the excessive force issue.

In short, a police officer attempting to locate a man walking in front of traffic at night was immediately approached by the man in a fighting stance, causing the officer to shout "Get away from me," as he tased the man. This is objectively reasonable in any location. Moreover, it is inarguable that the man did not die from the tasing. He died due to his own actions following the tasing. There cannot be a finding of excessive force by any rational jury and summary judgment should be afforded.

## III.    Taser Use and the Fourteenth Amendment

Plaintiffs attempt to build a state-created danger theory under the Fourteenth Amendment.

The Due Process Clause to the Fourteenth Amendment "does not impose a duty on the state to protect individuals from third parties." *Henry A. v. Willden*, 678 F.3d 991, 998 (9th Cir. 2012) (citing *Patel v. Kent Sch. Dist.,* 648 F.3d 965, 971 (9th Cir. 2011)). The Ninth Circuit, however, has recognized the two general exceptions: (1) the "special relationship" doctrine; and (2) the "state-created danger" doctrine. *Id.* Dotson here has only raised a claim under the "state-created danger" doctrine, which arises where the state officials took affirmative actions that "create[d] or expose[d] an individual to a danger which he or she would not have otherwise faced." *Kennedy v. City of Ridgefield,* (citing *DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 197, 201 (1989)). "To determine whether an official affirmatively placed an individual in danger, [the Court] ask[s]: (1) whether any affirmative actions of the official placed the individual in danger [s]he otherwise would not have faced; (2) whether the danger was known or obvious; and (3) whether the officer acted with deliberate indifference to that danger." *Willden*, 678 F.3d at 1002.
….
The Ninth Circuit has held that for purposes of the state-created danger exception, "deliberate indifference requires a culpable mental state," and thus, "[t]he state actor must recognize an unreasonable risk and actually intend to expose the plaintiff to such risks without regard to the consequences to the plaintiff." *Patel v. Kent Sch. Dist.,* 648 F.3d at 974 (citation and internal quotation omitted). The Ninth Circuit has allowed questions of deliberate indifference to proceed to trial, but has emphasized that these types of cases are highly fact-specific. *Id.* at 974-75. In cases where the deliberate indifference inquiry has survived summary judgment, the facts have involved a state actor's affirmative action directing danger toward the particular plaintiff at hand. *See, e.g.*, *Penilla v. City of Huntington Park,* 115 F.3d 707 (9th Cir. 1997) (two police officers' affirmative actions placed plaintiff in a

more dangerous position than the one they found him in when they found plaintiff to be in need of medical attention, moved him inside his house, locked the door, and left); *Kennedy v. City of Ridgefield*, 439 F.3d (police officer affirmatively created danger by notifying Michael Burns—a person with known violent tendencies—that plaintiff had reported him for molesting plaintiff's daughter, resulting in Mr. Burns shooting and killing plaintiff's husband, and shooting and severely wounding plaintiff).

*Dotson v. Funderburg*, 2016 WL 3248205 *4-5 (D. Idaho 2016).

The state-created-danger doctrine presupposes time to ruminate about one's actions, recognition of unreasonable risks and intent to expose a person to those risks. These lines of cases are expressly excluded from those involving rapidly unfolding events when an evolving set of circumstances take place over a short time necessitating fast action and presenting obligations that tend to tug against each other. In those cases, the standard is whether the officer acted with a purpose to harm for reasons unrelated to legitimate law enforcement objectives. *Porter v. Osborn*, 546 F.3d 1131 (9th Cir. 2008). The purpose-to-harm standard is applicable in this matter.

As with the excessive force claim, Plaintiffs attempt to use cases, such as *Faison, supra,* dealing with the tasing of fleeing suspects, which have no bearing here. The tasing occurred as an act of self defense.

Plaintiffs make the untenable claim that because ISP policy was violated, there was purpose to harm. This is specious for two reasons. One is that policy was not violated, the other is that policy was not relevant to Rivera's defending himself from being dragged into oncoming traffic.

Perhaps the best case demonstrating the faulty underpinnings of Plaintiffs' claim is *Jones v. Las Vegas Metro. Police Dep't*, 873 F.3d 1123, 1131 (9th Cir. 2017) – the very case Plaintiffs cite and purport to rely upon as to excessive force. In that case, the court held that a 90-second continuous burst on a fleeing subject was <u>not</u> a violation of the Fourteenth Amendment, because the taser was used during a rapidly evolving encounter and the "purpose to harm" standard applied, and that test was not met by the Plaintiff. "In cases like this, where officers must react quickly to

a rapidly changing situation, the test is whether the officers acted with a purpose of causing harm unconnected to any legitimate law enforcement objective." *Jones* at 1133. As can be seen, *Jones* is dispositive to Defendant Rivera, not the Plaintiffs.

Plaintiff do not attempt to assert that the tasing was so 'brutal' and 'offensive' that it did not "comport with traditional ideas of fair play and decency" as to violate substantive due process as "conscience shocking." See *Whitley v. Albers,* 475 U.S. 312, 327 (1986). Instead, they assert that the tasing was conscience shocking because it "stems here from a loss of familial relationship claim." They cite *Estate of Soakai v. Abdelaziz*, 137 F.4th 969, 976 n.2 (9th Cir. 2025).

*Soakai* does not remotely stand for the proposition that loss of a family member equates to a conscience shocking event. The case was described by the court as follows:

> Plaintiffs, a group of innocent bystanders, were injured by a driver who lost control of his car and crashed into them as a result of a high-speed car chase. Plaintiffs sued two police officers, claiming that the officers violated Plaintiffs' substantive due process rights in two ways: by initiating and conducting the chase for the purpose of harming the fleeing suspect and by failing either to call for emergency services or to render aid after the crash. Assessing only the pleadings, the district court ruled that the officers are not entitled to qualified immunity. The officers timely appeal. In the highly unusual circumstances of this case—including plausible allegations that the officers intentionally caused harm for reasons unrelated to any legitimate law enforcement purpose connected to the chase, and that they witnessed the crash yet drove away and later stated that they hoped that the crash caused a fatality—we affirm.

*Id.* at 975. The court held:

> The fundamental question for the purpose of deciding whether Plaintiffs have stated a substantive due process claim is whether Defendants' alleged conduct shocks the conscience. Porter, 546 F.3d at 1137. "[C]onduct intended to injure in some way unjustifiable by any government interest" sits at the far "end of the culpability spectrum" and, therefore, "is the sort of official action most likely to rise to the conscience-shocking level." Lewis, 523 U.S. at 849, 118 S.Ct. 1708. We see no reason to think that conduct is any less shocking when it injures someone other than the intended target, particularly when harm to a third party is a clear, known risk and is entirely foreseeable.
> We therefore hold that Plaintiffs have stated a substantive due process claim by plausibly alleging that they, as bystanders, were injured when Defendants engaged

in a high-speed chase for the purpose of harming the fleeing suspect without a legitimate law enforcement objective.

*Id.* at 980.  What note 2 actually says is:

> In addition to representing her son's estate, Lavinia seeks to recover for two different violations of her own due-process rights. The first stems from the injuries she personally suffered, and the other arises from the loss of a familial relationship. Because the same shocks-the-conscience standard applies to both types of claims, Porter v. Osborn, 546 F.3d 1131, 1137 (9th Cir. 2008), we will not differentiate between them in this opinion.

> In short, the facts and holding of *Soakai* do not stand for what Plaintiffs assert.  There is

no valid claim of a Fourteenth Amendment violation in this matter.

## IV.    Qualified Immunity

The facts demonstrate that a single taser burst was used against Robert as he was closing with Rivera on the edge of the freeway.  Plaintiffs oppose qualified immunity, citing cases involving passive resistance to an officer, *Ramsey v. City of Lake Havasu,* 2023 WL 6295189 (D. Ariz. 2023), and fleeing suspects, *Kennedy, supra, and Faison, supra*. What Plaintiffs do not do is cite a case that clearly establishes that it is unconstitutional to tase a person actively aggressing to an officer on or next to a freeway median.

A somewhat apposite case on the issue of qualified immunity is *Lal v. California*, 746 F. 3d 1112 (9th Cir. 2014), wherein a person led police on a high-speed chase, and later when on foot near the freeway, having expressed suicidal ideation, threatened the officers with a large rock while advancing.  An officer fatally shot the man and his wife sued.  The court granted qualified immunity.  The court stated:

> The confrontation was in a ditch alongside a freeway, and the officers could hardly allow Lal to proceed on foot onto the freeway. … But Lal forced the issue by advancing on the officers. By the time that Lal, contrary to the officer's commands, advanced to within seven or eight feet of the officers, thereby creating a reasonable fear of imminent serious physical harm, spraying Lal with pepper spray would not have stopped Lal from hurling the rock at the officers. The fact that Lal was intent

on "suicide by cop" did not mean that the officers had to endanger their own lives by allowing Lal to continue in his dangerous course of conduct.

746 at 1117.

In this case, there was no rock, but Robert, when taking up a fighting stance with a gun pointed at him said something like "do it." Once the firearm was put away and a taser drawn, Robert advanced on Rivera. As in *Lal,* letting Robert wander into the freeway was not an option as to safety of the public. While it can never be known with certainty if Robert was attempting suicide by cop, it was clear he had been jumping into traffic before Rivera got there. He heavily outweighed Rivera and Rivera had a right to defend himself from being dragged into traffic. The cases cited by Plaintiffs do not touch upon the central fact that police officers do not have to risk death in order to subdue an irrational subject. Because it is not clearly established that it is unconstitutional to tase an advancing subject on or near the freeway, qualified immunity must be afforded Mr. Rivera.

Plaintiffs devote considerable time and effort asserting that qualified immunity does not actually exist and/or was based upon a judicial error, compounding a codification error. In so doing, Plaintiff repeats the points made by Professor Reinert, *Qualified Immunity's Flawed Foundation*, 111 Cal. L. Rev. 201 (2023), and the writings of Judge Carlton Reeves. Given the limited time and pages afforded a litigant in a reply brief, it is impossible to discuss these theories in any substantive way. It is submitted that the courts that have examined these and similar arguments have taken the correct approach, which is to observe *stare decisis*.

> [H]owever seismic the implications of this lost-text research, " '[a]s middle-management circuit judges,' we cannot overrule the Supreme Court." Only that Court can definitively grapple with § 1983's enacted text and decide whether it means what it says—and what, if anything, that means for § 1983 immunity jurisprudence.

*Rogers v. Jarrett*, 63 F.4th 971 (5th Cir. 2023) (Willett, J. concurring).

> [T]he Supreme Court has long recognized the qualified immunity doctrine is "not constitutionally grounded and [is] essentially a matter of statutory construction," Butz v. Economou, 438 U.S. 478, 497 (1978), and explained that "Congress is free to change th[e] Court's interpretation of its legislation." *Pearson v. Callahan*, 555 U.S. 223, 233 (2009)(quoting Illinois Brick Co. v. Illinois, 431 U.S. 720, 736 (1977)). Congress has not done so, and the Supreme Court continues to consider the qualified immunity doctrine to be good law …. See *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S.——, 144 S. Ct. 1316 n.7 (2024)(instructing the Second Circuit it can consider qualified immunity on remand). Judge Reeves himself recognized that "qualified immunity is the law of the land and the undersigned is bound to follow its terms absent a change in practice by the Supreme Court" Jamison, 476 F. Supp. 3d at 409, and applied the doctrine in both cases. Plaintiff's argument is unpersuasive.

*Corbin v. Prummell,* 2024 WL 3470289 (M.D. Fla. 2024).

DATED this 20th day of February, 2026.

MICHAEL KANE & ASSOCIATES, PLLC

BY: */s/ Michael J. Kane*
     MICHAEL J. KANE
     Attorneys for Defendant Miguel Rivera, Jr.


<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 20th day of February, 2026, I electronically filed the foregoing document with the U.S. District Court.  Notice will automatically be electronically mailed to the following individuals who are registered with the U.S. District Court's CM/ECF System for this action:

- **Richard A. Eppink, David DeRoin, Megan Harrigfeld**
  ritchie@wrest.coop, david@wrest.coop, megan@wrest.coop

- **Richard A. Hearn**
  hearn@hearnlawyers.com; teresa@hearnlawyers.com, zach@hearnlawyers.com, leona@hearnlawyers.com, deeann@hearnlawyers.com]

- **Michael J. Kane**
  mkane@ktlaw.net, kdelisio@ktlaw.net

 */s/ Michael J. Kane*                           .
MICHAEL J. KANE