**RAÚL R. LABRADOR**
**ATTORNEY GENERAL**

**MICHAEL J. KANE**
**SPECIAL DEPUTY ATTORNEY GENERAL**
**MICHAEL KANE & ASSOCIATES, PLLC**
702 W. Idaho St., Suite 1100
Post Office Box 2865 (83701)
Boise, Idaho 83702
Telephone:  (208) 342-4545
Email:  mkane@ktlaw.net
Idaho State Bar No. 2652

ATTORNEYS FOR IDAHO STATE DEFENDANTS
         (MIGUEL RIVERA, JR.)

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ESTATE OF ROBERT THOMAS SEQUINTS, by and through its personal representative, XAVIER T. SEQUINTS; S.S., D.S., and J.S., minor children, by and through their guardian BRENT SEQUINTS, SR.; and BRENT SEQUINTS, SR., <br><br> Plaintiffs, <br><br> vs. <br><br> MIGUEL RIVERA, JR., in his individual capacity; IDAHO STATE POLICE, an Administrative Agency of the State of Idaho; STEVEN DAVIS and MATT SMITH, in their individual capacities; and JOHN/JANE DOES 1-10, other law enforcement officers whose true names are unknown, in their individual capacities, <br><br> Defendants. | Case No. 1:24-cv-00271-DKG <br><br> MEMORANDUM IN SUPPORT OF DEFENDANT MIGUEL RIVERA, JR.'S MOTION TO STRIKE PORTIONS OF THE DECLARATION OF MELINDA L. JORGENSEN, PH.D. (Dkt. 35-7) |

COMES NOW Defendant, MIGUEL RIVERA, JR., by and through his attorney of record, Michael J. Kane of the firm Michael Kane & Associates, PLLC, and hereby submits this Memorandum in Support of his Motion to Strike Portions of the Declaration of Melinda L. Jorgensen, Ph.D. (Dkt. 35-7).

## I.

## INTRODUCTION

Defendant filed his Motion for Summary Judgment and accompanying documents on January 16, 2026 (Dkts. 28, 28-1 through 28-5). Plaintiffs filed their *Response to Defendant Miguel Rivera, Jr.'s Motion for Summary Judgment (Dkt. 28)* (Dkt. 35) ("Plaintiffs' Response") and accompanying documents on February 6, 2026 (Dkts. 35, 35-1 through 35-26). Included with Plaintiffs' Response is the Declaration of Melinda L. Jorgensen, Ph.D. (Dkt. 35-7), attaching a Forensic Neuropsychological Evaluation authored by Melinda L. Jorgensen, Ph.D. (Dkt. 35-8) ("Evaluation") and a letter from Melinda Jorgensen, Ph.D. to Ritchie Eppink regarding the Gary Dawson report (Dkt. 35-9) ("Dawson Report letter"). The Evaluation and Dawson Report letter contain irrelevant, out-of-court, uncorroborated, self-serving statements of third parties that Defendants believe should be stricken.

## II.

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 12(f), "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Matter that is immaterial consists of "'that which has no essential or important relationship to the claim for relief or the defenses being pleaded.'" *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), *rev'd,* 510 U.S. 517, 114 S. Ct. 1023, 127 L. Ed. 2d 455 (1994). Matter that is impertinent

"'consists of statements that do not pertain, and are not necessary, to the issues in question.'" *Id*. Additionally, material that may create a risk of prejudice to a party may be stricken. *Id*.

Rule 56(c)(4) of the Federal Rules of Civil Procedure requires that affidavits submitted in support of a summary judgment motion be made based upon personal knowledge, set forth facts that would be admissible in evidence, and show affirmatively that the affiant is competent to testify to such matters. F.R.C.P. 56(c)(4). Further, a trial court can only consider evidence which is admissible at trial in ruling on a motion for summary judgment. See F.R.C.P. 56(c)(4); *Orr v. Bank of America, NT & SA*, 285 F. 3d 764, 773 (9th Cir. 2002); *Pamintuan v. Nanticoke Mem. Hosp.*, 192 F.3d 378, 388 (3rd Cir. 1999).

### III.

### ARGUMENT

Federal Rule of Evidence 401 states that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." F.R.E. 402 states that "[i]rrelevant evidence is not admissible."

An affidavit or declaration must "set out facts that would be admissible in evidence." F.R.C.P. 56(c)(4).

> The Court observes that much of Plaintiff's evidence is derived from her declaration and deposition testimony. The Ninth Circuit has held that "[s]pecific testimony by a single declarant can create a triable issue of fact," but that a court "need not find a genuine issue of fact if, in its determination, the particular declaration was 'uncorroborated and self-serving.'" *Neovi,* 604 F.3d at 1159 (citing *Villiarimo,* 281 F.3d at 1061). However, as discussed above, the Ninth Circuit in *Phan* court held that self-serving declarations can create a genuine issue of material fact; and that courts can only disregard a self-serving declaration in certain instances, such as when the declaration is conclusory or is based on facts beyond the declarant's personal knowledge. *Phan,* 500 F.3d 895, 909–10.

*Wigent v. Sci. Applications Int'l Corp.*, 19 F. Supp. 3d 1012, 1036 (D. Haw. 2014).

> Evidentiary affidavits filed in connection with motions for summary judgment must be made "on personal knowledge," with "[s]worn or certified copies" of any supporting documents attached. Federal Rule of Civil Procedure ("FRCP") 56(e). Where a party attempts to introduce an exhibit by attaching it to a declaration or affidavit, FRCP 56(e) requires that the declarant or affiant have personal knowledge of the exhibit. *Orr v. Bank of America, NT & SA,* 285 F.3d 764, 777 (9th Cir.2002). The evidence presented by both parties must be admissible. FRCP 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir.1979). Hearsay statements in affidavits are inadmissible. *Japan Telecom, Inc. v. Japan Telecom Am. Inc.,* 287 F.3d 866, 875 n. 1 (9th Cir.2002). Hearsay is any out-of-court statement, whether oral or written, offered in evidence to prove the truth of the matter asserted. FRE 801(a), (c). In the absence of a procedural rule or statute, hearsay is inadmissible unless it is defined as non-hearsay under FRE 801(d) or falls within a hearsay exception under FRE 803, 804, or 807. *See* FRE 802; 30B Michael H. Graham, *Federal Practice & Procedure: Evidence* § 7031 at 279. When a statement is hearsay within hearsay, or double hearsay, each statement must qualify under some exemption or exception to the hearsay rule. FRE 805; *United States v. Arteaga,* 117 F.3d 388, 396 n. 12 (9th Cir.1997).

*Chao v. Westside Drywall, Inc.,* 709 F. Supp. 2d 1037, 1048 (D. Or. 2010), *as amended* (May 13, 2010).

An expert witness must be "qualified as an expert by knowledge, skill, experience, training, or education…." F.R.E. 702.

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

F.R.E. 702.

In *Garcia v. Los Banos Unified Sch. Dist.,* the court prohibited expert testimony that would "summarize the Plaintiff's own statements made to the expert regarding what happened to Plaintiff" because the "potential for prejudice, confusion, and undue consumption of time outweighs the probative value of the evidence." *Garcia v. Los Banos Unified Sch. Dist.,* No. 1:04-CV-6059SMS,

2007 WL 715526, at *2 (E.D. Cal. Mar. 8, 2007). In addition, the expert in *Garcia* wished to opine on cultural practices, claiming she had "training in cultural diversity, had lived in Puerto Rico for four years, and currently treated Hispanic clients in Spanish, including a lot of people from Mexico, Puerto Rico, and Chile; she was a Catholic." *Id*. at *5. The expert also claimed to have knowledge of Mexican burial customs. *Id*. The court excluded the expert's testimony, finding that, pursuant to F.R.E. 702, "[a]lthough experience may be a sufficient basis for qualifying an expert, it does not appear that [the expert] had any special familiarity or experience with Mexican funeral practices…there is no evidence of [the expert's] qualifications to render an opinion on Mexican funeral practices or the special cultural significance of bereavement activities in Mexico." *Id*. *5-6.

> With respect to deposition testimony contradicting later statements submitted to the court:
>
> The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony. *See Foster v. Arcata Associates,* 772 F.2d 1453, 1462 (9th Cir.1985), *cert. denied,* 475 U.S. 1048, 106 S.Ct. 1267, 89 L.Ed.2d 576 (1986); *Radobenko v. Automated Equipment Corp.,* 520 F.2d 540, 543–44 (9th Cir.1975). "[I]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.

*Kennedy v. Allied Mut. Ins. Co.,* 952 F.2d 262, 266 (9th Cir. 1991).

Dr. Jorgensen is a clinical neuropsychologist whose "purpose of the evaluation was to consult and offer opinions regarding psychological trauma and mental health issues, and to discuss the potential long-and short-term impact on Robert Sequints' three children, as a result of their father's death." (Dkt. 35-8, p. 1). However, the Evaluation goes far beyond the impact on the Sequints children and Defendant argues that those portions of the Evaluation should be stricken.

On pages 3 and 4 of the Evaluation, Dr. Jorgensen lists the records she reviewed and includes a summary of what she found in those records: (1) Available medical records for Robert Sequints noting that he "had a history of mental health issues including Posttraumatic Stress

Disorder (PTSD); Mixed Bipolar Disorder with psychotic features; Major Depressive Disorder, recurrent, moderate; and anxiety." (Dkt. 35-8, p. 3); (2) Available police records; (3) Available autopsy and toxicology reports; and (4) Available victimology report by Detective Marshall. These will each be discussed separately.

(1) Available medical records for Robert Sequints. Mr. Sequints' medical condition is not an issue in Defendant's Motion, so the records are irrelevant. They are also hearsay, as they are being used for the truth of their contents. As such, the medical records should be stricken.

(2) Available police records. Dr. Jorgensen did not use all the police records available but picked and chose what records to use. Defendant did not include these records in his motion. For Plaintiffs to now have their expert regurgitate hearsay and put it in their opposition to Defendant's Motion as to what happened on the night in question is inappropriate. These records are irrelevant and are also hearsay. As such, the police records should be stricken.

(3) Available autopsy and toxicology reports. These documents were used in Defendant's Motion and therefore Defendant does not object to their use.

(4) Available victimology report by Detective Marshall. According to the report, Detective Marshall had a telephone interview with Chastity Teton, whose statements are triple hearsay. The report also relies on statements made by Marlise Stacey, which are triple hearsay. In addition, Mr. Sequints' state of mind is not at issue in Defendant's Motion, which only states that Mr. Sequints attacked Defendant Rivera and was intoxicated. This report was not used in Defendant's Motion and is irrelevant. As such, the victimology report should be stricken.

In support of Defendant's Motion, the only records from Dr. Jorgensen's list that were included were the autopsy and toxicology reports. Defendant does not include the other records in his motion, and none of his arguments relate to these records. Defendant's Motion claims that the Sequints children do not have standing to bring this lawsuit. The purpose of the Evaluation was to discuss the effects on the Sequints children. However, Plaintiffs are using Dr. Jorgensen's Evaluation to include irrelevant and inadmissible information into their opposition. As such, the medical records, police records, and victimology report should be stricken.

With respect to the collateral interviews in the Evaluation, Defendant submits that these should also be stricken. Dr. Jorgensen recalls a meeting with Brent Sequints, Robert Sequints' father. (Dkt. 38-5, pp. 4-5). Brent Sequints made statements in this interview that are contrary to his deposition testimony. In his interview with Dr. Jorgensen, he claimed that Robert struggled with "addiction to alcohol" and that the children were removed from his care "at various times." Brent Sequints claimed that Robert "participated in chemical dependency treatment, attended court hearings, and worked with the program to bring his children home." Brent Sequints also claimed that Robert:

> prioritized his children and tried to be a responsible parent. While living in his father's home, Robert spent time with his children and helped raise them. For example, for two years, he drove his children to and from school, so his father did not have to change his work schedule. Robert also worked a variety of jobs to provide some financial support. In the year prior to his death, according to Mr. Sequints, Robert accepted responsibility of his children. He was making changes in his life to be more stable and have consistent housing… There was no indication he was experiencing emotional turmoil or mental health issues. Mr. Sequints never knew Robert to be suicidal. He did not have a history of suicide attempts or other self-harming behavior.

The following are portions of the deposition of Brent Sequints, dated March 11, 2025 (Dkt. 35-11):

> Q. …it looked like at least by around 2019 12 that Robert was experiencing some kind of mental health issue where they were recommending a counselor and a

psychiatrist. Do you have any information about what his mental health issues were in 2019?

THE WITNESS: I have no idea what that is or anything. I have no knowledge of it.

Q. (BY MR. KANE) You were not even aware that as of 2019 he was recommended to see a psychiatrist?

A. No, sir.

Q. He never spoke to you about that at all?

A. No, sir.

Q. Were you surprised to hear that?

A. Yes, I was.

(Brent Sequints, Sr. Depo. 9.)

Q. Did you ever see anything in his behavior that indicated that he had mental health issues?

A. No, I didn't. I never seen anything like what 4 you're referring to.

Q…See what I'm talking about, the narrative in the middle of the page? It says, "His dreams disturb him. We disc" -- which means "discussed" -- "that he needs to take his meds in order for them to help him." So, first question: Did he ever talk about his dreams disturbing him to you?

THE WITNESS: Not to me.

Q. (BY MR. KANE) Okay.

A. This is the first time I've known about it.

Q. Was he living with you in 2019?

A. No.

Q. Do you know where he was living?

A. No.

Q. No idea at all?

A. No idea at all. He was moving around from one place to another.

Q. Okay. So you wouldn't be able to tell us anything about what medications he was on; is that right?

A. No, sir, I couldn't.

Q. There was another record -- and we can pull it up if you need to -- but it spoke about him being diagnosed with posttraumatic stress disorder. Are you aware of any event in his life that created traumatic stress?

A. No.

Q. Not at all?

A. Not at all. You asked that earlier. I have no idea.

Q. Was that surprising to you, to hear about that?

A. Yes, it was.

(*Id.* 10:1-4, 8-13, 15-25, 11:1-15.)

    A. And the second child, the second one, I didn't even know she had a second child until way later. But I knew about the oldest one. That was the one that we all went to go out and go eat.

    Q. Were you aware of the third child?

    A. No, sir, not until, oh, 12 months after she was pregnant, then I knew.

    Q. So do you know if Robert had any relationship with these children? As you sit here, can you describe what it might have been?

    A. Yes.

    Q. Tell us.

    A. They lived on the reservation for -- reservation, he lived with Kelsey. And I would -- they lived out -- way out, too far for me to go. So I would meet them in Fort Hall somewhere, and I'd visit with them. But they did lose that home after I don't know how long. I think it got repossessed. I'm not sure. I couldn't answer that. That -- after that, they lived -- they moved from house to house, and I didn't know until later about what they were doing. They were taking the kids. And I didn't know they were in foster care at the time. So I really couldn't tell you, couldn't say anything about that until after the second time. Then they did get a house. And he took care of them.

MEMORANDUM IN SUPPORT OF DEFENDANT MIGUEL RIVERA, JR.'S MOTION TO STRIKE PORTIONS OF THE DECLARATION OF MELINDA L. JORGENSEN, PH.D. (Dkt. 35-7) – P. 9

(*Id*. 13:13-25, 14: 1-13.)

> A. Why the court stepped in?
>
> Q. Yes.
>
> A. That was the question?
>
> Q. Yes. Why -- what was going on in their lives that required -- say again?
>
> A. I have no idea what was going on in their lives. Like I said, like I said earlier, they were living in another house outside of mine.
>
> Q. All right.
>
> A. I have no idea what was going on or what they were doing or have any knowledge of what was going on in their lives at that time.
>
> Q. Go to page 2 of this same document. This seems to indicate that there was drug use by Robert and that he also had a warrant out for him. Do you know anything about that?
>
> A. No.
>
> Q. Did you know Robert was using drugs?
>
> A. No.
>
> Q. Did you know he had a warrant out?
>
> A. What was that?
>
> Q. Did you know he had a warrant out for him?
>
> A. No.
>
> Q. Do you have any information on Robert's history with the criminal justice system?
>
> A. No, I don't.
>
> Q. Do you know when he was first arrested?
>
> A. No, I don't.
>
> Q. Do you know when he was first incarcerated?

>A. No, I don't.
>
>Q. Do you know where he was incarcerated?
>
>A. No, I don't.
>
>Q. Do you know -- you do know that he was incarcerated; right?
>
>A. I knew that, but I don't know of any -- what for, when, how long. I have no idea about that.
>
>Q. So as you sit here, you don't know if it was once, twice, three, four, five times he was in jail?
>
>A. No, I don't.

(*Id.* 16: 8-25, 17: 1-21.)

>Q. Okay. So let me see if I can articulate what I think you're telling me. Kelsey Bear was a bad influence on these children because she was drinking in front of them and using drugs? Am I right so far?
>
>A. Yes.
>
>Q. And Robert was in and out of jail? Am I right?
>
>A. Yes.
>
>Q. All right. But you don't know why or what situations?
>
>A. I have no idea.

(*Id.* 23: 4-14.)

>Q. Did he live with you permanently during that year, or did he live sporadically during that year with you?
>
>A. He lived -- he lived with me Monday through Friday.
>
>Q. And then what would happen on the weekends?
>
>A. Sometimes he'd go fishing with the kids and they take them out, and sometimes he would go see his girlfriend at the time.
>
>Q. Who was that?

MEMORANDUM IN SUPPORT OF DEFENDANT MIGUEL RIVERA, JR.'S MOTION TO STRIKE PORTIONS OF THE DECLARATION OF MELINDA L. JORGENSEN, PH.D. (Dkt. 35-7) – P. 11

A. I believe it was Chastity. Her name was Chastity Teton.

Q. Was he exhibiting during that year that you just spoke about any symptoms of mental health issues?

A. No. I didn't have any idea about his mental or physical health was getting, his body. When I was reading it, it was all new to me.

Q. How about did he exhibit any symptoms of being under the influence of alcohol?

A. No, sir, not while he was with me.

Q. How about drugs?

A. No, sir.

Q. Now, I understand it's hard to look at an autopsy report for your own child. But this report seems to indicate that Robert had been using methamphetamine and marijuana and had a blood alcohol of .257 on the day that he passed. You were unaware of his drug use and alcohol use at the time of his death?

A. I never -- I never knew nothing about his usage or whatever he was doing. When he lived with me -- when he lived with me, he never did any of those things you're accusing him of.

Q. (BY MR. KANE) Well, for the record, I'm not accusing him of anything. I'm just telling you what's in the autopsy report. Did he ever express to you that he might have a problem with meth?

A. Like I said earlier, I have no idea.

Q. Never any discussion at all, ever? Is that what you're telling me?

A. No, sir.

Q. Was he working in that last year before he passed away?

A. Yes.

Q. Where was he working?

A. At a potato place in Arbon Valley.

Q. How long did he work there?

A. I don't know. He worked there for a couple of days, I believe.

Q. Is that it?

A. Yes, because he didn't -- …Well, I didn't finish. I didn't finish. Because he quit the potato warehouse to help raise his kids while I went to work, take them to school and pick them up.

Q. (BY MR. KANE) Okay. So he only worked two days, then? Do I understand you? Is that what you're saying?

A. I said a couple of days. I have no idea how long. I just know he worked there for a couple of days. He needed to come back home and take the kids to school and pick them up.

Q. Maybe as long as a week, you think?

A. Maybe. I'm not sure. I just know it's been a couple of days. That was it.

Q. So I'm trying to understand his relationship with the children during this time period. It sounds like he stayed at home while you went to work?

A. Yes.

Q. And except for the weekends; when you would be there on the weekends, he would leave and do whatever he wanted to do?

A. Not all the time.

Q. But sometimes?

A. Yes.

Q. Was he, to your knowledge, facing criminal charges during that last year of his life?

A. I have no idea… I said I have no idea. I really couldn't tell you or answer that question.

Q. (BY MR. KANE) So you heard me ask your brother about two women that he knew stating to the police that he had made statements to the effect that he couldn't go back to jail. Do you have any idea what he was talking about?

A. No, sir. It's the first time I've heard about that.

Q. All right.

A. I never even read it or -- just till now when you mentioned it, it's the first time I've heard about it.

(*Id*. 28: 13-25, 29: 1-9, 19-25, 30: 3-25, 31: 4-25, 32: 1-5, 9-21.)

> Q. I'm talking about the year that he lived with you.
>
> A. The year he lived with me?
>
> Q. Yes. Do you have anything that shows that he spent money to support these children?
>
> A. No.

(*Id*. 33: 14-19.)

Mr. Sequints contradicted his deposition testimony when interviewed by Dr. Jorgensen. He told Dr. Jorgensen that Robert returned home to get sober, tried to be a responsible parent and worked a variety of jobs to provide financial support. However, his deposition testimony indicated that he was not involved in much of Robert's life, which would seemingly make it difficult to know what kind of parent he was. For example, Mr. Sequints testified that although he did not know specific details, he did know Robert had been in and out of jail. He testified that he himself did not know of the existence of the two younger Sequints children "until much later." He testified that Robert only worked at a potato warehouse for a couple of days. In his deposition, Mr. Sequints claimed that he had nothing showing that Robert spent money to support his children. Mr. Sequints also testified that he was unaware of Robert using alcohol or drugs or having mental issues, despite stating the opposite to Dr. Jorgensen. Mr. Sequints' interview with Dr. Jorgensen is self-serving hearsay that Plaintiffs are trying to introduce to the court through Dr. Jorgensen's report. This is inappropriate and should be excluded.

In addition, pursuant to *Kennedy v. Allied Mut. Ins. Co.,* 952 F.2d 262, 266 (9th Cir. 1991), "a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." Plaintiffs are now trying to raise an issue of fact by submitting Dr. Jorgensen's report of Mr. Sequints' interview, which contradicts his own prior testimony. As stated in *Kennedy*, "this would greatly

diminish the utility of summary judgment as a procedure for screening out sham issues of fact." For these reasons, Dr. Jorgensen's interview summary of Mr. Sequints should be excluded.

Dr. Jorgensen then discusses her interview with the Sequints children, which has nothing to do with Defendant's Motion and is irrelevant. Defendant's Motion does not address the issue of damages, it is simply arguing that the children have no standing to bring the lawsuit. This interview summary contains self-serving hearsay, is irrelevant and inadmissible. (Dkt. 35-8, pp. 5-6).

Next is Dr. Jorgensen's interview summary with Ellen Ball, a "tribal elder who worked at the Shoshone-Bannock Tribal Museum for several years." (Dkt. 35-8, p. 6). Ms. Ball discussed various beliefs, customs, and practices occurring on the reservation. Again, this has nothing to do with Defendant's Motion, is hearsay and irrelevant. Additionally, as stated above, in *Garcia v. Los Banos Unified Sch. Dist.,* an expert's opinion on cultural practices was prohibited pursuant to F.R.E. 702 because there was no evidence of the expert's qualifications. *Garcia v. Los Banos Unified Sch. Dist.,* No. 1:04-CV-6059SMS, 2007 WL 715526, at *2, 5-6 (E.D. Cal. Mar. 8, 2007). The court found that "[a]lthough experience may be a sufficient basis for qualifying an expert, it does not appear that [the expert] had any special familiarity or experience with Mexican funeral practices…there is no evidence of [the expert's] qualifications to render an opinion on Mexican funeral practices or the special cultural significance of bereavement activities in Mexico." *Id*. *5-6. Here, Ms. Ball has worked at the Shoshone-Bannock Tribal Museum "for several years" but, as found in *Garcia*, it does not appear she has any special familiarity with the culture to render an opinion. Therefore, Dr. Jorgensen's interview summary with Ms. Ball should be prohibited pursuant to F.R.E. 702 and because it is irrelevant and inadmissible hearsay.

With respect to Dr. Jorgensen's Evaluation regarding "Decedent's State of Mind," this is entirely irrelevant and is hearsay. (Dkt. 35-8, pp. 7-8). Dr. Jorgensen was hired and qualified to talk about the effect of Robert's death on the Sequints children. She is now opining on what Robert was

thinking, relying on hearsay from Ellen Ball, Robert's father, and Ms. Stacey. The Evaluation notes a history of distrust of police officers, and that Robert was in a state of fight or flight, was confused, was having difficulty managing his emotions and behavior. Dr. Jorgensen states that Robert "believed in oral traditions and storytelling among tribal members. He wanted to live in harmony and balance and often felt unbalanced at times in his life." Dr. Jorgensen stated that Robert "never engaged in parasuicidal behavior or suicide attempts in the past." This is pure speculation, not based on any testing or method that Dr. Jorgensen could complete and out of the scope of Dr. Jorgensen's qualifications. The entirety of Dr. Jorgensen's Evaluation regarding Decedent's state of mind is inadmissible and should be stricken.

The remainder of the Evaluation discusses the Sequints children. In the section regarding the "Relationship with Decedent" Dr. Jorgensen states that "Robert repeatedly participated in court proceedings and reunification plans to maintain his parental rights and continue to have contact with his children." (Dkt. 38-5, p. 8). This is contrary to what the evidence shows and there is nothing that has been disclosed to Defendant supporting this statement. Also, this portion of the Evaluation is based on hearsay and should be excluded. The remainder of the Evaluation (psychological distress, daily functioning, future prognosis, treatment) deals with damages, which is not relevant for purposes of Defendant's motion and should be stricken.

In the Dawson report letter (Dkt. 35-9), Dr. Jorgensen reviewed a report authored by Gary Dawson, Ph.D. FASCP, BCPP, dated June 23, 2025. Dr. Dawson prepared a report after his review of the blood toxicology of Robert Sequints. Dr. Jorgensen has not shown that she has the necessary qualifications to support her opinions regarding toxicology and what caused Mr. Sequints' behavior. She also opines as to Mr, Sequints' mistrust of police officers, which she bases on the opinion of Ms. Ball which, as argued above, should be stricken. Dr. Jorgensen continues to discuss what Mr. Sequints was feeling and why he engaged in certain behaviors. Again, Dr. Jorgensen cannot opine to this

because she had no way of knowing what Mr. Sequints was feeling and is outside the scope of her qualifications. Regardless, Defendant did not submit the Dawson Report with its motion, so it is irrelevant to the present motion and inadmissible.

## IV.

## CONCLUSION

For these reasons, Defendant requests the Court strike the relevant portions of the Evaluation (Dkt. 35-8) and the Dawson Report letter (35-9) in its entirety.

DATED this 20th day of February 2026.

>                         MICHAEL KANE & ASSOCIATES, PLLC
>
>                     BY: */s/ Michael J. Kane*
>                         MICHAEL J. KANE
>                         Attorneys for Idaho State Defendants

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 20th day of February, 2026, I electronically filed the foregoing document with the U.S. District Court. Notice will automatically be electronically mailed to the following individuals who are registered with the U.S. District Court's CM/ECF System for this action:

- **Richard A. Eppink**, **David DeRoin, Megan Harrigfeld**
  ritchie@wrest.coop, david@wrest.coop, megan@wrest.coop

- **Richard A. Hearn**
  hearn@hearnlawyers.com; teresa@hearnlawyers.com, zach@hearnlawyers.com, leona@hearnlawyers.com, deeann@hearnlawyers.com]

- **Michael J. Kane**
  mkane@ktlaw.net, kdelisio@ktlaw.net

>                          */s/ Michael J. Kane*                         .
>                          MICHAEL J. KANE