UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ESTATE OF ROBERT SEQUINTS, by and through its personal representative, XAVIER T. SEQUINTS; S.S., D.S., and J.S., minor children, by and through their guardian BRENT SEQUINTS, SR.; and BRENT SEQUINTS, SR., <br><br> Plaintiffs, <br><br> v. <br><br> MIGUEL RIVERA, JR., in his individual capacity, et al., <br><br> Defendant. | Case No. 4:24-cv-00271-DKG <br><br> **MEMORANDUM DECISION AND ORDER** |

**INTRODUCTION**

This case arises from the death of Robert Thomas Sequints, who died following contact with Idaho State Trooper Miguel Rivera, Jr. As a result, Plaintiffs filed this lawsuit. Presently before the Court are Defendant's Motion for Summary Judgment (Dkt. 28) and Motion to Strike (Dkt. 38). The motions are fully briefed and ripe for the Court's consideration.[1] A hearing on the motions was conducted on July 29, 2026. (Dkt. 46, 47). Having carefully considered the record, the parties' briefing and supporting materials,

---

[1] The parties have consented to proceed before a United States Magistrate Judge in this matter pursuant to 28 U.S.C. § 636(c)(1) and Local Civil Rule 72.1(a)(1). (Dkt. 15).

MEMORANDUM DECISION AND ORDER - 1

and argument, the Court will grant the Motion for Summary Judgment and deny the Motion to Strike for the reasons that follow.

## BACKGROUND

**1.      Factual Background[2]**

### A.      The Sequints Children

The decedent in this case, Robert Thomas Sequints ("Robert"), was the son of Plaintiff Brent Sequints, Sr. ("Brent"), and the father of the three surviving minor children, S.S., D.S., and J.S. (collectively "the Sequints children"). (Dkt. 28-1 at ¶ 2; Dkt. 35-1 at ¶ 2). The parties dispute to what extent Robert cared for, financially supported, or participated in his children's lives.

Initially, the Sequints children lived with their mother and Robert. When Robert was incarcerated, the children lived with their mother. On June 22, 2017, while Robert was incarcerated, the children were taken from their mother's custody and placed into foster care. (Dkt. 43 at 43–45; Dkt. 35-11 at 18:16–19:5). Thereafter, the children were placed in foster care by the Shoshone Bannock Tribal Court on several occasions, before the Tribal Court eventually granted Brent permanent guardianship of the children on January 22, 2018. (Dkt. 28-3 at 25–26; Dkt. 28-1 at ¶ 9; Dkt. 35-1 at ¶ 9; Dkt. 35-11 at 13:20–14:20). Robert was present and consented to the permanent guardianship. (Dkt.

---

[2] Consistent with the standard on summary judgment, the factual background is written to reflect that all evidence in the record is construed in a light most favorable to the non-moving party, who is also given the benefit of all reasonable inferences which can be drawn from that evidence.

28-3 at 25–26) (noting "Robert is incarcerated and is unable to make progress on his case plan at this time.").

Beginning approximately December 2020, Robert lived with Brent and the Sequints children for a period of approximately eighteen months until his death on June 23, 2022. (Dkt. 28-1 at ¶ 28; Dkt. 35-1 at ¶ 28). The children remain living with Brent, who is their guardian and primary caregiver. (Dkt. 28-1 at ¶ 15; Dkt. 35-1 at ¶ 15).

B.    The Events Surrounding Robert's Death

On the evening of June 23, 2022, Defendant Miguel Rivera, Jr. ("Rivera"), an Idaho State Trooper, responded to a dispatch call relaying reports of a man stepping in front of cars on the I-15 freeway near Pocatello, Idaho. (Dkt. 28-1 at ¶ 30; Dkt. 35-1 at ¶ 30). Video footage depicting the area before Rivera arrived on scene shows a man in a red shirt walking slowly in the dark across the freeway, including, at one point, a semi-truck slowing down to avoid hitting the man. (Dkt. 28-3 at 66).

Rivera approached the location in his patrol car, heading north on the freeway. Upon nearing the reported location at approximately 11:27 p.m., Rivera spotted an article of red clothing lying in the median near the entrance of an emergency vehicle turnaround lane between the freeway lanes and pulled his patrol vehicle into the emergency lane. (Dkt. 28-1 at ¶¶ 32, 34; Dkt. 35-1 at ¶¶ 32, 34). Rivera's emergency flashing lights remained activated. The dash camera video footage shows Rivera parked the patrol vehicle at approximately a ninety-degree angle from the northbound freeway lanes from where he came. (Dkt. 28-4 at 11 (hereinafter "Dash Cam Video"), at 11:27:33–55). The

MEMORANDUM DECISION AND ORDER - 3

patrol vehicle faced the body of the median, with the headlights and dash camera pointed toward the southbound freeway lanes across the median.[3] (*Id.*; Dkt. 28-1 at ¶ 33; Dkt. 35-1 at ¶ 33).

The encounter began at approximately 11:28 p.m., when Rivera exited his patrol vehicle and radioed that a man, later identified as Robert Sequints, was laying down in the median. (Dash Cam Video at 11:28:10–14). Robert was shirtless at the time of the encounter, wearing only grey pants and laying face down in the grassy median between the freeway lanes. (Dkt. 28-4 at ¶ 19). Immediately after radioing, Rivera can be heard saying "Let me see your hands," "Don't move," and "Stop moving" several times before radioing to dispatch that he had the man at gunpoint. (*Id.* at 11:28:14–30). Immediately following the radio update, Rivera continues to order Robert to stop moving five more times over the next fifteen seconds. (*Id.* at 11:28:30–45).

Rivera contends that Robert turned and ran south into the left lane of the northbound freeway lanes, toward oncoming traffic. Rivera did not see a weapon in the back of Robert's waistline as Robert moved away from him, so he holstered his firearm and drew his taser.

Next, Rivera can be heard commanding Robert to get on the median twice, followed by "On the median or you get tased." (*Id.* at 11:28:45–50). Immediately after,

---

[3] Because of the position of the patrol vehicle, video footage of the remaining events was not captured on the dash camera. The audio captured from the video and Rivera's subsequent statements are the only evidence of what occurred during the approximately two-minute encounter that resulted in Robert's tragic death.

MEMORANDUM DECISION AND ORDER - 4

Rivera says "Get away from me" twice. (*Id.* at 11:28:50–53). At this point in the audio, the sound of the taser clicking can be heard, and Rivera shouts "Ay! Ay! Ay!" (*Id.* at 11:28:53–58).

The parties dispute exactly where Robert was standing when Rivera tased him and whether Robert remained incapacitated from the taser beyond the five-second burst. It is undisputed that, after being tased, Robert stood and "stumbled and fell again in the middle of the northbound lanes." (Dkt. 35 at 10) (citing Rivera's deposition).

Immediately following the taser burst, Rivera shouts "Don't move!" three times. (Dash Cam Video at 11:28:58–11:29:04). Next, Rivera radios "One tased," asks for backup, and states "We're in the middle of the intersection, I am going to get hit." (*Id.* at 11:29:04–11:29:15). Rivera then shouts, "Don't move," and Robert says "Sorry." (*Id.* at 11:29:15–19). Rivera shouts for Robert to "Get up and go in the corner" followed by two more shouted commands to get up, and Robert responds, "I can't." (*Id.* at 11:29:19–28). Rivera again shouts at Robert to stand up, and Robert responds, indicating there is something in his hand. (*Id.* at 11:29:28–31). Rivera then shouts "Stand up! Stand up! Stop!" (*Id.* at 11:29:31–35). Robert can be heard saying "You fucking shot me" just before Rivera shouts "Move the fuck over to the right!" (*Id.* at 11:29:35–38). Thereafter, Robert and Rivera can be heard shouting back-and-forth, Robert stating "You fucking shot me" four times, while Rivera shouts three more commands for him to go to the curb. (*Id.* at 11:29:38–48). Rivera then abruptly shouts "Stop moving! Go to the god damn right!" and Robert begins to say something as the sound of an oncoming vehicle gets

MEMORANDUM DECISION AND ORDER - 5

louder and Rivera shouts "Stop! Get up!" (*Id.* at 11:29:48–53). As the sound of the vehicle gets louder, Rivera shouts "God damn it! God damn it!" followed by something unclear ending in "got hit." (*Id.* at 11:29:48–11:30:00). Rivera again shouts "God damn it!" and then radios "Control five five six he just got hit by a car I need code three medical!" (*Id.* at 11:30:01–09). The entire encounter occurred in approximately two minutes.

An unknown vehicle struck and killed Robert in the middle of the freeway lanes. The autopsy report determined Robert's cause of death was multiple blunt force injuries. (Dkt. 28-3 at 67). Toxicology reports taken at the time of the autopsy show that Robert had a blood alcohol level of .257 as well as the presence of THC and methamphetamine. (Dkt. 28-1 at ¶ 44; Dkt. 35-1 at ¶ 44; *see* Dkt. 28-3 at 67–75).

### 2.      Procedural History

On June 9, 2024, Plaintiffs Xavier T. Sequints, the administrator of the Estate of Robert Sequints ("Estate"); Robert's three surviving minor children; and Brent, the natural father of Robert Sequints and the guardian of the Sequints children, filed the Complaint in this action against Defendants Rivera, in his individual capacity; the Idaho State Police, an administrative agency of the state of Idaho; Steven Davis, the Idaho State Police Eastern Command Major; and Matt Smith, the Idaho State Police HQ Patrol Captain. (Dkt. 1). Count One of the Complaint alleged excessive force, in violation of the Fourth and Fourteenth Amendments against all Defendants, pursuant to 42 U.S.C. §

1983. Count Two alleged wrongful death/negligent supervision and training against Idaho State Police, pursuant to Idaho state statutory and common law.

Defendants filed an Answer to the Complaint on July 16, 2024. (Dkt. 8). On August 15, 2025, Defendants moved for partial judgment on the pleadings, arguing that Davis and Smith should be dismissed from the case, that Count Two should be dismissed, and that Brent is not a proper Plaintiff. (Dkt. 11). After the motion was fully briefed, the Court dismissed Count Two of the Complaint, the claims asserted against Defendants Davis and Smith, and the Fourteenth Amendment claim as asserted by the Estate. (Dkt. 18). The Court permitted Plaintiffs to file an amended complaint, but the time to do so has since expired. Accordingly, the remaining § 1983 claims are against Rivera in his individual capacity: (1) a Fourth Amendment excessive force claim, brought by the Estate; and (2) Fourteenth Amendment due process claims for loss of society, brought by the Sequints children and Brent. *Id.*

On January 16, 2026, Rivera moved for summary judgment as to both remaining claims. (Dkt 28). Plaintiffs filed their Response on February 6, 2026, arguing there are genuine disputes of material fact that preclude summary judgment as to both claims. (Dkt. 35). On February 20, 2026, Rivera filed his Reply (Dkt. 37), and a Motion to Strike, arguing portions of the Declaration of Melinda Jorgensen (Dkt. 35-7) should be stricken. (Dkt. 38). Plaintiffs opposed the Motion to Strike, (Dkt. 39), and Rivera filed his reply. (Dkt. 45). The Court heard oral arguments on the Defendant's Motion for Summary Judgment and Motion to Strike on July 29, 2026.

MEMORANDUM DECISION AND ORDER - 7

## STANDARD OF LAW

Summary judgment is appropriate where a party demonstrates that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is a fact that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact and a favorable judgment is due as a matter of law. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In evaluating whether the moving party has met this burden, the Court views the evidence in the light most favorable to the non-moving party and the Court must not make credibility findings. *Anderson*, 477 U.S. at 255. If the moving party satisfies its initial burden, the non-moving party must identify facts sufficient to show a genuine issue for trial to defeat the motion for summary judgment. *Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000). The non-moving party must go beyond the pleadings and show "by…affidavits, or by the depositions, answers to interrogatories, or admissions on file," that a genuine dispute of material fact exists. *Celotex*, 477 U.S. at 324. The Court must grant summary judgment if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

## DISCUSSION

Rivera moves for summary judgment on Plaintiffs' two remaining Section 1983 claims, arguing that (1) Plaintiffs lack standing under Section 1983; (2) even with standing, the Fourth and Fourteenth Amendment claims must fail because there is no genuine dispute of fact that Rivera did not use excessive force in violation of the Fourth Amendment, or that his actions "shock the conscience" in violation of the Fourteenth Amendment; (3) causation is lacking; and (4) qualified immunity otherwise bars the suit. (Dkt. 28-2 at 9–13).

### 1.    Standing

Section 1983 provides a civil cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by any person acting "under color of any statute, ordinance, regulation, custom, or usage, or any State or Territory." 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights," but rather "a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (quotations omitted).

Significantly here, survival actions and claims for loss of companionship and society brought pursuant to Section 1983 are legally distinct. While Fourth Amendment rights are personal in nature and may generally only be brought by the person whose rights were violated, "the survivors of an individual killed as a result of an officer's excessive use of force may assert a Fourth Amendment claim on that individual's behalf if the relevant state's law authorizes a survival action." *Moreland v. Las Vegas*, 59 F.3d 365, 369 (9th Cir. 1998). Claims for loss of companionship and society, on the other

hand, permit parents and children of a decedent to assert a Section 1983 claim based on the deprivation of *their* liberty interests arising out of the decedent's death. *Id.* at 371. Accordingly, a claim for loss of society raises a different constitutional violation than a survival action. *See Curnow By & Through Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) (holding claims of excessive force under the Fourth Amendment may generally only be claimed by the victim, while a parent or child of the victim may bring a different constitutional claim based on their loss of companionship or society as a result of the victim's death).

Here, the first Section 1983 claim is a survival action brought by the Estate on behalf of *Robert*, asserting that Robert's death resulted from excessive force by Rivera, in violation of Robert's Fourth Amendment rights. (Dkt. 1 at ¶ 97; Dkt. 18 at 9). Rivera argues the *Sequints children* do not have standing through the Estate to bring the Fourth Amendment survival action under Section 1983. (Dkt. 28-2 at 7–9). In making this argument, Rivera asserts that a survivor action under the Fourth Amendment is, by definition, on behalf of the heirs. (Dkt. 28-2 at 7). As discussed above, a survival action is an action brought by the decedent's survivors on behalf of the decedent, not the heirs. *Moreland*, 59 F.3d at 369. The Court has already determined that only the Estate, through Xavier Sequints as the administrator, may properly bring this survival action on behalf of Robert under Section 1983. (Dkt. 18 at 9). Defendant's arguments against standing at this stage are therefore moot as well as unavailing. For the same reasons as previously discussed, the Court finds the Estate has standing to bring the Fourth Amendment survival action. (*See Id.*).

MEMORANDUM DECISION AND ORDER - 10

The second Section 1983 claim is a claim for loss of society brought by the Sequints children and Brent, asserting deprivations of their liberty interests as a result of Robert's death, in violation of the Fourteenth Amendment. (Dkt. 1 at ¶¶ 99–100; Dkt. 18 at 9). The Court also previously determined that Fourteenth Amendment claims based on the deprivation of the heirs' liberty interests are properly brought by the children and parents of a decedent, pursuant to 42 U.S.C. § 1983. (Dkt. 18 at 9). Nonetheless, Rivera argues on summary judgment that the Sequints children lack standing to bring such a claim because the familial relationship with Robert was severed, and therefore, the Fourteenth Amendment does not protect their rights to a continued relationship.[4]

A child has a "constitutionally protected liberty interest under the Fourteenth Amendment in the 'companionship and society' of her father." *Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1230–31 (9th Cir. 2013) (quoting *Curnow By and Through Curnow*, 952 F.2d at 325). While the relevant authority on this matter generally pertains to the parent's rights, "children's Fourteenth Amendment rights to companionship with their parents have been interpreted as reciprocal to their parents' rights." *Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1058 (9th Cir. 2018) (citing *Smith v. City of Fontana*, 818 F.2d 1411, 1418–19 (9th Cir. 1987) (citation modified) ("a child claims constitutional protection for her relationship with a parent, there is no custodial interest implicated, but only a companionship interest."). The United States Supreme Court has established that

---

[4] Rivera conceded at oral argument that he only disputes the Sequints children's standing; he does not argue against Brent's standing to bring a Fourteenth Amendment claim for loss of society arising from his relationship as Robert's parent.

parental rights require a relationship more enduring than biology. *Lehr v. Robertson*, 463 U.S. 248, 260 (1983). An unwed father's liberty interest is protected under the Fourteenth Amendment when he "demonstrates a full commitment to the responsibilities of parenthood by 'com[ing] forward to participate in the rearing of his child,'. . . . At that point it may be said that he 'act[s] as a father toward his children.'" *Id.* at 261 (quoting *Caban v. Mohammed*, 441 U.S. 380, 392 (1979)).

Rivera cites to *Lehr* and *Wheeler* to support his position. Neither case is on point. *Lehr* concerned a biological father who did not participate in the rearing of his child or affirmatively protect his parental rights by filing with the state's putative father registry, and the Supreme Court found he was not entitled to notice before the husband of the child's biological mother adopted the child. 463 U.S. 248. Notably, the Court in *Lehr* discussed the distinction between "inchoate and a fully developed relationship" of an unwed father, noting the father must accept "some measure of responsibility for the child's future[.]" *Id.* at 261 n.17, 262. The Court referenced numerous commentators emphasizing the importance of a father admitting paternity and employing state methods for solidifying his paternal rights. *Id.* at 261 n.17, 262 n.18. *Wheeler* found a biological son of a woman who died after a confrontation with police could not assert a due process claim for loss of companionship because the mother had legally severed her relationship with the man by surrendering him, as an infant, for adoption. 894 F.3d at 1057-58.

Here, Robert employed or attempted to employ the relevant state methods to solidify his paternal rights. In Idaho, an unmarried father is not listed on his child's birth certificate, absent a notarized Voluntary Acknowledgment of Paternity Affidavit. Idaho

**MEMORANDUM DECISION AND ORDER - 12**

Code § 39-255(e)(2). Here, Robert is listed as the father on the birth certificates of S.S. and D.S, but not J.S. (*See* Dkt. 35–24). Plaintiffs produced a copy of the Acknowledgment of Paternity Affidavit for J.S.[5], signed by Robert and notarized on August 1, 2017. (Dkt. 35-24 at 5–7). The Acknowledgment, however, is not signed by the mother, nor is there any indication that it was filed with the vital statistics unit of the department of health and welfare, as required. *See* Idaho Code §§ 16-1513; 7-1111. Therefore, Robert came "forward to participate in the rearing of his child," by legally establishing paternity for S.S. and D.S. and attempting to do the same for J.S. *Id.* at 261.

Additionally, prior to Brent's permanent guardianship, the children lived with Robert and their mother when Robert was not incarcerated. While Robert eventually consented to Brent's permanent guardianship, he maintained parental visitation rights over the children, and the children were never legally adopted. Therefore, it cannot be said that Robert's parental rights were legally severed to the same extent as in *Lehr* or *Wheeler*. Further, it is undisputed that Robert spent the last eighteen months of his life living with Brent and the children. (Dkt. 28-1 at ¶ 28; Dkt. 35-1 at ¶ 28). Viewing the facts in the light most favorable to Plaintiffs, Robert stayed home with the children during the weekdays to care for the children, including taking the older children to school, while Brent went to work during this period. (Dkt. 35-11 at 31:18–21; Dkt. 28-1 at ¶¶ 27–29).

---

[5] J.S., the youngest Sequints child, was born on February 23, 2017. (Dkt. 25-24 at 7).

MEMORANDUM DECISION AND ORDER - 13

Taken together, these facts are sufficient to conclude the children each had constitutionally protected liberty interests under the Fourteenth Amendment in the continued companionship and society of their father that was protected by the Fourteenth Amendment at the time of his death. Accordingly, the Court finds the Sequints children have standing to maintain their Fourteenth Amendment claims for loss of companionship and society arising out of Robert's death.

Having clarified that the Estate has standing to bring the Fourth Amendment survival action under Section 1983 and that the children have standing to pursue their Fourteenth Amendment claims under Section 1983, the Court turns to the merits of the claims challenged at summary judgment.

## 2.    Qualified Immunity

Rivera asserts that both claims are barred by the theory of qualified immunity. In resolving a claim of qualified immunity, the court must construe disputed factual and credibility issues in favor of the nonmoving party. "Summary judgment [for the defendant] is improper if, resolving all disputes of fact and credibility in favor of the party asserting the injury, (1) the facts adduced show that the officer's conduct violated a constitutional right, and (2) that right was clearly established at the time of the violation." *Kirkpatrick v. Cnty. of Washoe*, 843 F.3d 784, 788 (9th Cir. 2016) (cleaned up). On the second prong of the analysis, the plaintiff bears the burden of showing the rights allegedly violated were clearly established. *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017).

**MEMORANDUM DECISION AND ORDER - 14**

Qualified immunity is a question of law, not a question of fact. *Torres v. City of Los Angeles*, 548 F.3d 1197, 1210 (9th Cir. 2008). "Immunity ordinarily should be decided by the court." *Hunter v. Bryant*, 502 U.S. 224, 228 (1991). Nonetheless, "[w]hen there are disputed factual issues that are necessary to a qualified immunity decision, these issues must first be determined by the jury before the court can rule on qualified immunity. The issue can then be raised in a Rule 50(a) motion at the close of evidence." *Morales v. Fry*, 873 F.3d 817, 824 (9th Cir. 2017) (quoting *Ninth Circuit Model Civil Jury Instruction* 9.34 (2017)). If, however, the only material dispute concerns what inferences properly may be drawn from the historical facts, a district court should decide the issue of qualified immunity. *Conner v. Heiman*, 672 F.3d 1126, 1131 n.2 (9th Cir. 2012) ("[W]hile determining the facts is the jury's job (where the facts are in dispute), determining what objectively reasonable inferences may be drawn from such facts may be determined by the court as a matter of logic and law.").

### A.      The Fourth Amendment Excessive Force Claim

Rivera argues he is entitled to summary judgment on the Estate's Section 1983 claim for excessive force under both prongs of the qualified immunity doctrine.

### i.      Constitutional Violation

A seizure of a person is unreasonable, and therefore a violation of the Fourth Amendment, when a police officer uses excessive force. *Graham*, 490 U.S. at 396. Courts employ an "objective reasonableness" test to determine whether force was excessive in violation of the Fourth Amendment. *Id.* at 398–99. Assessing objective reasonableness under the *Graham* test "requires a careful balancing of the nature and

**MEMORANDUM DECISION AND ORDER - 15**

quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal quotation marks and citations omitted).

### a.    The Use of the Taser Constituted Intermediate Force

"The first step of the excessive force inquiry requires [a court] to assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted." *Lowry v. City of San Diego*, 858 F.3d 1248, 1256 (9th Cir. 2017) (cleaned up).

Here, it is undisputed that Rivera used his taser in dart-mode a single time, and that the electric pulse from the taser burst stopped after five seconds. (Dkt. 28-1 at ¶ 45; Dkt. 35-1 at ¶ 45). According to the Idaho State Police Procedure, a taser or a "Conducted Energy Device," is designed to temporarily incapacitate a subject through the use of an electrical current which interferes with the body's neuromuscular system and produces a sensation of pain." (Dkt. 35-18 at 3). In the Ninth Circuit, tasers such as the one used here "when used in dart-mode constitute an intermediate, significant level of force that must be justified by the governmental interest involved." *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010).

Plaintiffs argue the facts and circumstances surrounding the use of the taser in this case created a substantial risk of death or serious bodily injury to Robert. (Dkt. 35 at 5–6). Specifically, Plaintiffs argue that because Rivera used his taser in an active freeway and Robert ultimately died, the quantum of force used here could reasonably be considered deadly force, requiring a heightened justification for the use of force in the

MEMORANDUM DECISION AND ORDER - 16

second part of the *Graham* analysis. (Dkt. 35 at 5–6). Plaintiffs point to Rivera's potentially conflicting statements about where Robert was located at the time of his tasing (e.g., while on the edge of the median (Dkt. 28-4 at ¶ 23), or in the left lane of traffic) to support their argument. On summary judgment, factual disputes are generally resolved in favor of the non-moving party. Doing so here,[6] the Court assumes Robert was tased while in the left lane of traffic, temporarily paralyzing him and causing him to fall on the road. Rivera "observed that the male being tased had neuromuscular incapacitation (NMI) also known as complete body lock up from being tased." (Dkt. 35-20 at 2 "Rivera's Written Statement"). In his deposition testimony, Rivera confirmed as much, stating that Robert fell down for approximately five seconds during the taser burst. (Dkt.

---

[6] This case presents a particularly difficult issue, where one of the only two eyewitnesses to the encounter died. In such a case, the Court must "carefully examine 'all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, ... to determine whether the officer's story is internally consistent and consistent with other known facts.'" *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014) (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)) ("[A court] must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably."). *See Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014) ("[W]e cannot simply accept what may be a self-serving account by the police officer ... [b]ecause the person most likely to rebut the officers' version of events ... can't testify." (cleaned up)). Here, the Court has reviewed each of Rivera's statements in the record: the Dash Cam Audio recording of the incident (Dkt. 28-4 at 11); the June 29, 2022 audio recording of his interview with the Pocatello Police Department (Dkt. 35-21, Ex. AA); Rivera's written statement and drawn diagram of the scene (Dkt. 35-19, 35-20); Rivera's Deposition Testimony (Dkt. 35-15); and Rivera's Affidavit in Support of Summary Judgment (Dkt. 28-4). In the recorded interview six days after the incident, Rivera stated Robert was in the left lane or left shoulder of the interstate when he was tased. (Dkt. 35-21, Ex. AA at 30:07–30:25; 47:25–49:45). This is consistent with his deposition testimony, where Rivera repeatedly stated that Robert was in the left shoulder of the interstate when he was tased. (Dkt. 35-15 at 103:7–104:1; 107:3–108:1). However, as Plaintiffs point out, Rivera's written statement and drawn diagram appear to indicate Robert was in the left lane, rather than the shoulder or median. (Dkt. 35-19, 35-20). Additionally, Rivera's Affidavit at summary judgment is somewhat inconsistent on this point, stating that Robert was on the edge of the median when he was tased. (Dkt. 28-4). For purposes of this analysis, the Court will construe these facts in the light most favorable to Plaintiff and assume Robert was standing in the left lane of traffic when Rivera tased him.

MEMORANDUM DECISION AND ORDER - 17

35-15 at 20, 64:3–23; 31, 107:22–108:13). Critically, it is undisputed that Robert rose after being tased, and, viewing the facts in the light most favorable to Plaintiffs,[7] "stumbled and fell again in the middle of the northbound lanes" where he remained for approximately 56 seconds, until he was ultimately struck by an unknown vehicle and killed. (Dkt. 35 at 10) (citing Dkt. 35-15).

While certain uses of tasers have been deemed deadly force, those cases are limited to factual circumstances well beyond what occurred here. Plaintiffs first point to *Jones v. Las Vegas Metro. Police Dept.* for their argument that "[s]ome uses of tasers 'create[] a substantial risk of serious injury or death' and therefore constitute deadly force." (Dkt. 35 at 5–6) (quoting *Jones v. Las Vegas Metro. Police Dept.*, 873 F.3d 1123, 1131 (9th Cir. 2017)). In *Jones*, when an unarmed suspect fled from a traffic stop, the police officer initially deployed his taser twice, causing the suspect's body to "lock up" and fall to the ground. *Jones*, 873 F.3d at 1127. The officer then knelt on the suspect's back and continued to tase the suspect after backup arrived and while another officer simultaneously tased the suspect. *Id.* In all, the suspect in *Jones* was subjected to taser shocks for over ninety seconds and died as a result. *Id.* In considering the quantum of force used, the Ninth Circuit concluded the initial use of the taser to stop the suspect was

---

[7] Plaintiffs argue Rivera's statements on this fact are inconsistent because Rivera first stated that Robert "stood up after the tasing, but then 'fell' in the middle of the two northbound lanes", but in his affidavit supporting the motion for summary judgment, Rivera stated that Robert "lay down." (Dkt. 35 at 2) (quoting Rivera's Written Statement and Dkt. 28-4 at ¶ 26). The Court, having reviewed the entire record, construes this fact in the light most favorable to Plaintiffs and resolves this conflict in their favor. (*See* Rivera's Written Statement at 2 ("Right after the male got tased, he stood up and ran northeast, then fell in the middle of both the northbound lanes of travel."); Dkt. 35-15 at 38, 136:1–11 ("Based off my recollection, he just ran back into the roadway and laid down and - - or tripped or fell down or whatever it was.")).

reasonable, but that as the situation evolved, the justification of the use of force waned. *Id.* at 1130. Ultimately, the Court concluded triable issues of fact prevented summary judgment in part because a reasonable juror could conclude the officers were on notice that their *continued use* of the tasers created a substantial risk of serious injury or death, amounting to deadly force. *Id.* at 1131 (emphasis added).

Plaintiffs also cite an unpublished decision, *Faison by and through Flores v. Knea*, where the Northern District of California discussed a police officer's use of a taser on a suspect fleeing toward a body of water. No. 24-CV-06059-JSC, 2025 WL 3685198 (N.D. Cal. Dec. 18, 2025). In that case, the court differentiated five taser bursts deployed on the fleeing suspect. After the first and second taser bursts, the suspect fell to the ground, got up, and continued to run toward a body of water. *Id.* at *2. The parties agreed those taser discharges constituted intermediate force under *Bryan*. *Id.* at *7. The Court concluded that the final three bursts aimed at the suspect's back, which occurred while the suspect approached or had entered the water, could reasonably create a substantial risk of drowning, and therefore could be deemed deadly force. *Id.* at *11–12. That court relied on out-of-circuit cases to extend the holding in *Jones* to these novel circumstances. *See Bradley v. Benton*, 10 F.4th 1232, 1241 (11th Cir. 2021) (holding a reasonable jury could find tasing a suspect in a precarious position atop an eight-foot wall constituted deadly force) and *Peroza-Benitez v. Smith*, 994 F.3d 157, 167–68 (3d Cir. 2021) (collecting cases establishing the "risk in using a taser on an individual positioned on an elevated surface is that the individual could fall off said surface once incapacitated by the taser and suffer serious injury or death.").

MEMORANDUM DECISION AND ORDER - 19

These cases are distinguishable. Here, even assuming Robert was standing in the left lane of traffic when he was tased, this is not a situation where continuous or simultaneous tasing of a suspect in a dangerous location created a substantial risk of serious injury or death. Rather, here, Rivera deployed a single taser burst in dart mode. These circumstances are more akin to the first two taser discharges considered in *Faison* to be intermediate force, especially where here, like in *Faison*, Robert got up after being tased and continued toward the dangerous location, the middle of the freeway. Ultimately, the risk in using the taser included the same resulting immediate injury as contemplated in *Bryan* – losing muscular control and falling, uncontrolled, face first into the pavement. *Bryan*, 630 F.3d at 824 (recognizing that the physiological effects, high pain levels, and foreseeable risk of physical injury related to a sudden and uncontrolled fall contribute to deeming taser usage as an "intermediate, significant level of force"). For these reasons, the Court is not persuaded by Plaintiffs' attempts to categorize Rivera's use of force as deadly under these circumstances.[8] This Court will apply *Jones* and *Bryan* consistently with other decisions in this District to find that the single use of a taser in dart mode constitutes intermediate force. *See, e.g. Hall v. McClure*, No. 1:22-CV-00277-AKB, 2024 WL 3696114, *7 (D. Idaho Aug. 7, 2024), *appeal dismissed*, No. 24-5550, 2024 WL 6840673 (9th Cir. Dec. 24, 2024).

---

[8] Because the Court declines to adopt the reasoning articulated in *Faison* to extend the *Jones* holding to these circumstances, it need not reach the parties' arguments regarding causation.

**MEMORANDUM DECISION AND ORDER - 20**

### b.    Applying the *Graham* Factors

Next, in weighing the Government's interest, the Court considers: "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Williams v. City of Sparks*, 112 F.4th 635, 643 (9th Cir. 2024) (citation modified). The second factor – whether the suspect posed an immediate safety risk – is the most important factor. *Id.* However, these factors are not exclusive. *Id.* (citing *Bryan*, 630 F.3d at 826). "Other relevant factors may include the availability of less intrusive force, whether proper warnings were given, and whether it should have been apparent to the officer that the subject of the force used was mentally disturbed." *Id.* The Court therefore asks whether the totality of the circumstances justified the particular type of force. *Curnow By and Through Curnow*, 952 F.2d at 325.

The Supreme Court has long emphasized reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving ...." *Graham*, 490 U.S. at 396–397. Nevertheless, given the fact-intensive nature of excessive force cases, summary judgment should be granted sparingly. *See Gonzalez*, 747 F.3d at 795.

**MEMORANDUM DECISION AND ORDER - 21**

### 1.      Immediate Threat

Turning first to the most important *Graham* factor, the Court finds there is no genuine dispute that Robert objectively posed an immediate threat of danger to Rivera and the public.

"A desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury." *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001). "Rather, the objective facts must indicate that the suspect poses an immediate threat to the officer or a member of the public." *Bryan*, 630 at 826. "[A] simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern. In short, an officer's use of force must be objectively reasonable based on his contemporaneous knowledge of the facts." *Deorle*, 272 F.3d at 1281. In determining whether Robert's behavior objectively posed an immediate threat, the Court first summarizes the "facts and circumstances confronting" Rivera as he arrived on scene. *Graham*, 490 U.S. at 396.

Rivera entered the scene on the night of June 23, 2022, with limited knowledge. The dispatch report indicated that a man was seen on the freeway stepping in front of vehicles. Rivera admits he wondered if the intent was suicide. When Rivera exited his patrol vehicle at approximately 11:28 p.m., he saw a shirtless man lying face down in the grassy area of the median and radioed an update. The audio of the encounter that ensued between Rivera and Robert, set forth in detail above, is undisputed.

MEMORANDUM DECISION AND ORDER - 22

Rivera's account of what happened next is internally consistent and consistent with the other known evidence. Immediately after he radioed dispatch, Rivera heard a rustling in the grass, Robert quickly stood up and got into a fighting stance with his fists balled up, and then began to reach behind him to his waistband. (Dkt. 28-4 at ¶ 11; Rivera's Written Statement; Dkt. 31-21, Ex. AA at 22:20–22:40). Rivera then drew his firearm out of fear Robert was reaching for a weapon. (Dkt. 28-4 at ¶¶ 12–13; Dkt. 31-21, Ex. AA at 22:20–23:10). Rivera began to order Robert to show his hands, and shouted at Robert not to move. (Dash Cam Video at 11:28:14–11:28:31). Rivera can be heard radioing to dispatch that he had Robert at gunpoint. (*Id.*). Next, Robert ran into the left lane toward the northbound traffic away from Rivera, and Rivera, recognizing that Robert was unarmed, holstered his firearm and drew his taser instead. (Dkt. 28-4 at ¶ 15; Rivera's Written Statement; Dkt. 35-15 at 60:15–61:1; Dkt. 31-21, Ex. AA at 23:43–24:25). Plaintiffs do not dispute these events, nor do they contend that Rivera used excessive force when he drew his firearm.

It is at this point in the encounter that Rivera contends Robert began to aggress him and close the distance between them. Rivera weighs 170 pounds, and he estimated Robert weighed about 250 pounds at the time of their encounter. (Dkt. 28-4 at ¶ 21). According to the autopsy report, Robert weighed 218 pounds. (Dkt. 28-3). Rivera testified that he was concerned for the safety of motorists on the road and for his own safety, fearing that Robert's behavior would cause a passing vehicle to overcorrect and/or crash. (Dkt. 28-4 at ¶ 19). Further, Rivera testified that he used his taser to stop Robert

from physically attacking him after shouting for Robert to get away from him, because he determined that he could not safely physically engage or wrestle Robert under these circumstances. (*Id.* at ¶ 39). Rivera has consistently stated that Robert returned to a fighting stance, began bobbing and weaving, got on the ground and back up as if he were doing a burpee or a pushup, and then returned to a fighting stance, before closing distance between he and Rivera with his fists raised. (*Id.* at ¶¶ 18, 20; Rivera's Written Statement at 1; Dkt. 35-15 at 62:13–64:5; Dkt. 31-21, Ex. AA at 26:33–28:39). Further, Rivera's assertion that Robert aggressed him prior to the tasing is supported by the audio recording. Rivera is heard commanding Robert to get on the median twice, followed by "on the median or you get tased." (Dash Cam Video at 11:28:45–50). Immediately after, Rivera says "get away from me" twice before deploying his taser. (*Id.* at 11:28:50–53).

At this point in the audio, the sound of the taser clicking can be heard. (*Id.* at 11:28:53–58). It is undisputed that Rivera used his taser in dart-mode a single time, the darts contacted the front of Robert's body, and the electric pulse from the taser burst stopped after five seconds. (Dkt. 28-1 at ¶ 45; Dkt. 28-4 at ¶ 23; Dkt. 35-1 at ¶ 45). As discussed previously, the Court assumes Robert was tased while standing in the left lane of traffic, causing his body to lock up, temporarily paralyzing him and causing him to fall on the road. Robert lay down for approximately five seconds during the taser burst. Robert then rose and stumbled and fell in the middle of the northbound lanes, where he was ultimately struck by a vehicle and killed approximately fifty-six seconds later.

**MEMORANDUM DECISION AND ORDER - 24**

That Robert physically threatened Rivera here is, as discussed, not genuinely disputed. Despite being unarmed, Robert raised his fists and approached Rivera in an aggressive manner. Rivera directed Robert to get back on the median three times and then said "Get away from me" twice, just seconds before he tased Robert, supporting Rivera's assertions that Robert was approaching him. The taser probes made contact with the front side of Robert's body, indicating Robert was facing Rivera at the time of the tasing. Moreover, the disparity in size between Robert and Rivera posed an obvious risk of physical harm, where Robert weighed over 215 pounds and Rivera weighs 170 pounds. *See Isayeva v. Sacramento Sheriff's Dept.*, 872 F.3d 938, 949–50 (9th Cir. 2017) (finding the resistance posed by an unarmed, naked man who weighed 250 pounds and whom the officers had reason to believe was under the influence of drugs, posed an obvious risk of physical harm to the officers). Finally, these events occurred on an active freeway at night, increasing the danger to Rivera and to the public at large. Taken together, the location of the events, the limited visibility, the extremely short timeframe in which the encounter unfolded, the immediate aggression and erratic behavior exhibited by Robert, the fact that Robert did not comply with Rivera's orders, the physical disparity between the two, and the fact that numerous vehicles passed during the encounter, are objective factors that indicate Robert posed an immediate threat of danger to Rivera and the public. On these facts, the Court concludes there is no genuine dispute that Robert threatened Rivera and the public with immediate serious harm. *Compare to Bryan*, 630 F.3d at 827 ("An unarmed, stationary individual, facing away from an officer at a distance of fifteen to twenty-five feet is far from an 'immediate threat' to that officer. . . . Nor was [the

**MEMORANDUM DECISION AND ORDER - 25**

decedent's] erratic, but nonviolent behavior a potential threat to anyone else, as there is no indication . . . [of] traffic on the street at the time of the incident.").

### 2.    Severity of the Crimes

Turning to the next *Graham* factor, the Court finds the possible crimes at issue do not weigh strongly in favor of either Plaintiffs or Rivera. The Ninth Circuit has "applied [the severity of crime] factor in two slightly different ways." *Nehad v. Browder*, 929 F.3d 1125, 1136 (9th Cir. 2019). First, the Ninth Circuit has concluded that "a particular use of force would be more reasonable, all other things being equal, when applied against a felony suspect than when applied against a person suspected of only a misdemeanor." *Id.* Second, courts "use[ ] the severity of the crime at issue as a proxy for the danger a suspect poses at the time force is applied." *Id.*

Rivera points to Robert's conduct after Rivera arrived on scene, arguing the behavior constitutes assault under the relevant Idaho statutes, and that, given the circumstances, it amounts to a severe crime supporting the use of intermediate force. Plaintiffs assert that the severity of the crime at issue –responding to reports of a man stepping in front of vehicles on the freeway – amounts to no more than a welfare check, and further, that Robert's behavior prior to the tasing did not amount to assault.

Rivera's argument that Robert's conduct amounts to a severe crime supporting the use of intermediate force reflects the second approach taken to analyzing the severity of the crime factor. *Nehad*, 929 F.3d at 1136. In *Nehad*, the Court reasoned that even where the reported conduct is a misdemeanor, it may not be dispositive to the severity of the

**MEMORANDUM DECISION AND ORDER - 26**

crime factor if the conduct "posed a serious threat" and could have been characterized as felonious. *Id.* Ultimately, the court concluded that even if the decedent had committed a serious crime prior to the officer's arrival, because there was no dispute that the decedent was not engaged in such conduct when the officer arrived or when the officer fired his weapon, a jury could reasonably conclude that the severity of the decedent's crimes did not favor the use of force. *Id.* (discussing the use of deadly force).

Here, Robert was not engaged in any serious crime when Rivera arrived on the scene. Robert was lying face-down on the median. Robert's conduct during the encounter with Rivera, however, amounted to a misdemeanor under the relevant Idaho statutes. Assault as defined in Idaho is "[a]n intentional, unlawful threat by word or act to do violence to the person of another, coupled with an apparent ability to do so, and doing some act which creates a well-founded fear in such other person that such violence is imminent." Idaho Code § 18-901(b). As discussed above, there is no genuine dispute that a reasonable officer would believe that Robert posed an immediate threat at the time Rivera used his taser. Further, for the same reasons discussed herein, Rivera's fear of Robert's violence was well founded given the circumstances. Accordingly, Robert's actions amounted to assault as defined in Idaho. Plaintiffs argue otherwise, pointing to the fact that Robert cannot be heard making any verbal threats in the audio recording, and that Rivera stated in his declaration in support of summary judgment that Robert ran away from him. The other minor discrepancies Plaintiffs rely on relate to the exact

MEMORANDUM DECISION AND ORDER - 27

positioning of where Robert and Rivera stood at the time of the tasing, and Rivera's actions after the use of force at issue here.

While the Court must view the facts in the light most favorable to Plaintiff, the Court cannot permit unfounded assertions of fact to preclude summary judgment. When, as here, "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Accordingly, it is insufficient for Plaintiffs to attempt to create "metaphysical doubts" about the accuracy of Rivera's testimony by concluding that Robert's undisputed behavior did not amount to assault. Rather, "while determining the facts is the jury's job (where the facts are in dispute), determining what objectively reasonable inferences may be drawn from such facts may be determined by the court as a matter of logic and law." *Heiman*, 672 F.3d at 1131 n.2.

Contrary to Rivera's argument, however, assault is regarded as a misdemeanor even when the victim is a police officer.[9] "While the commission of a misdemeanor offense is not to be taken lightly, it militates against finding the force used to effect an arrest reasonable where the suspect was also nonviolent and posed no threat to the safety of the officers or others." *Bryan*, 630 F.3d at 828-29 (citation omitted). Here, the same

---

[9] *See* Idaho Code § 18-915(1)(b) (providing that a person who commits a crime under this chapter, including assault, against a police officer shall incur a punishment double that as listed in the respective section); Idaho Code § 18-902 (providing assault is punishable, in part, by imprisonment in the *county* jail not exceeding three months); and Idaho Code § 18-111 (defining a felony as a crime punishable by death or imprisonment in *state* prison, whereas a misdemeanor is punishable with imprisonment in *county* jail).

cannot be said where Robert posed a threat to the safety of the officer and the public, particularly those driving on the freeway at night in the dark. On balance, the Court finds the severity of the crimes at issue do not particularly favor either side.

### 3.    Whether Robert was Resisting or Evading Arrest

The final *Graham* factor asks the Court to determine whether the suspect was resisting. *Graham*, 490 U.S. at 396. In the Ninth Circuit, "resistance" under the excessive force analysis "should not be understood as a binary state, with resistance being either completely passive or active." *Bryan*, 630 F.3d at 830. Rather, "it runs the gamut from the purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer." *Id.* Ultimately, "the crux of this *Graham* factor is compliance with the officers' requests, or refusal to comply." *Mattos v. Agarano*, 661 F.3d 433, 450 (9th Cir. 2011).

Here, Robert initially ran away from Rivera into the freeway before turning back and aggressing Rivera as previously discussed. As such, Robert was not a fleeing suspect at the time of being tased, and there was no active arrest being made. However, Robert was attempting to physically assault Rivera by raising his fists and closing distance, and he did not comply with any of Rivera's commands. When directed to stop moving numerous times, Robert turned and ran into the freeway. Thereafter, Rivera holstered his gun, switched to his taser, and commanded Robert to get on the median. Robert did not comply with this command either. Plaintiffs make a fleeting attempt at establishing an issue of fact on this point by arguing Rivera's inconsistent statements regarding where

exactly Robert was standing when he was tased could permit a reasonable trier of fact to conclude that Robert was complying with Rivera's orders to return to the median when he was tased. (Dkt. 35 at 7). This is unsupported by the record and, as discussed at length elsewhere in this order, Plaintiffs provide no competent evidence to support his version of the facts or to rebut Rivera's consistent statements in the record that Robert did not comply with his orders. "Mere allegation and speculation do not create a factual dispute for purposes of summary judgment." *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996) (citation omitted). Accordingly, Robert's active resistance weighs in favor of finding the use of force reasonable.

### 4.    Other Considerations

As discussed, the three *Graham* factors are not exclusive. The Court must consider other relevant factors. *Williams*, 112 F.4th at 643 ("Other relevant factors may include the availability of less intrusive force, whether proper warnings were given, and whether it should have been apparent to the officer that the subject of the force used was mentally disturbed.").

In some cases, the absence of a warning or order to halt prior to deploying forceful measures against a suspect may suggest that the use of force was unreasonable. *Deorle*, 272 F.3d at 1283–84. That is not the case here, where it is undisputed that Rivera ordered Robert to get on the median twice, followed by warning him "on the median or you get tased," (Dash Cam Video at 11:28:45–50), and immediately thereafter, Rivera said "get away from me" twice, seconds before tasing Robert. (*Id.* at 11:28:50–53).

Plaintiffs argue that Rivera's single warning prior to using the taser may have been insufficient, citing *Glenn v. Washington Cnty.*, for the argument that a jury could find that the lone warning was not heard or understood by Robert. 673 F.3d 864 (9th Cir. 2011). The facts in *Glenn* are distinct from the facts here. In *Glenn*, the court noted that the decedent may not have heard the officers' warnings because he was intoxicated and there were other people yelling. *Id.* at 876. Additionally, the warning there was determined to be somewhat ambiguous, as the officer yelled "beanbag, beanbag," and the decedent may not have known what that meant. *Id.* Here, there is no indication beyond speculation that Robert did not hear or understand Rivera's warning, and the warning here was not ambiguous. While it is true that the toxicology report verifies Robert was intoxicated at the time of his death, that alone is insufficient to turn this factor in Plaintiffs' favor. Rivera's issuance of a warning therefore weighs in favor of finding the taser use reasonable.

Next, Plaintiffs argue that Rivera had less intrusive alternatives to tasing and immobilizing Robert on the active freeway, including developing a plan to take control of Robert, setting up traffic control measures, or waiting for backup before tasing him. (Dkt. 35 at 9). Plaintiffs point to the Idaho State Police guidelines and an expert opinion to support this argument. (*See* Dkt. 35-18; Dkt. 35-3). The less intrusive alternatives identified by Plaintiffs are relevant to Rivera's conduct prior to leaving his vehicle and before he encountered an aggressive Robert. These arguments focus on whether Rivera's overall conduct was reasonable, rather than whether his use of the taser was reasonable.

**MEMORANDUM DECISION AND ORDER - 31**

Even if a reasonable juror could conclude that Rivera should have worn a high visibility safety vest or set up traffic control cones before approaching Robert as Plaintiffs contend, these options do not account for the split-second decision Rivera faced when Robert came toward him, fists raised, on the active freeway. Even assuming that a reasonable juror could conclude that Rivera violated police policy by using his taser without backup, this is insufficient to conclude that Rivera acted unreasonably given the totality of the circumstances. It is well settled that officers "need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable." *Henrich*, 39 F.3d at 915.

Finally, Plaintiffs argue that because Rivera suspected Robert may have been suicidal, the governmental interest in the use of force was diminished. (Dkt. 35 at 7–9). Plaintiffs rely on an unpublished decision from the District of Arizona to argue that "[e]ven when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual." *Ramsey v. City of Lake Havasu City*, No. CV-20-08189-PCT-DLR (ESW), 2023 WL 6295189, *13 (D. Ariz. Sept. 27, 2023), *aff'd,* No. 23-3244, 2025 WL 66048 (9th Cir. Jan. 10, 2025) (quoting *Deorle*, 272 F.3d at 1283). These cases are distinguishable. In *Deorle*, the Ninth Circuit confronted a situation where an officer used a less than lethal beanbag shot to shoot an intoxicated, suicidal man, who was walking toward the officer at a steady gait

with a bottle or a can in his hand. *Deorle*, 272 F.3d at 1281. The officer observed the man at close proximity for between five and ten minutes before shooting him, and did so without warning. *Id.* In *Ramsey*, an officer tased the plaintiff in dart mode while removing him from a courtroom. *Ramsey*, 2023 WL 6295189 at *13. The officer did not issue a warning before tasing, did not consider less intrusive means to subdue the plaintiff before tasing, and knew the plaintiff was autistic and had not committed a serious crime. *Id.* Notably absent from both of these cases are exigent circumstances such as what Rivera encountered here. Rivera suspected Robert was suicidal or otherwise experiencing a mental health crisis, but the similarities end there. Unlike in both cases relied on by Plaintiffs, Rivera issued a warning before using his taser. Rivera did consider less intrusive means, as established by the fact that he immediately holstered his firearm and opted for his taser instead, upon confirming that Robert was not armed.

In weighing the relevant factors, the Court in *Deorle* noted that, *ordinarily*, an unarmed, emotionally distraught individual creating a disturbance or resisting arrest creates a lower governmental interest in the use of force because such force may, in some circumstances, exacerbate the situation. *Deorle*, at 1282–83. Ultimately, the Court declined to create a bright-line rule requiring a different use of force for an emotionally distraught or mentally ill person, emphasizing instead that it is merely a factor courts must consider under the totality of the circumstances. *Id.* In doing so here, this Court finds the fact that Rivera suspected Robert was suicidal or experiencing a mental crisis insufficient to overcome the reasonableness of force where Robert aggressed him near an active freeway. This was not a case where the officer was faced with an individual crying

MEMORANDUM DECISION AND ORDER - 33

for help as Plaintiffs would have this Court find. Rather, the key difference here is that Robert constituted an objectively immediate threat.

### c.    Balancing the Interests

The Court's review of the *Graham* factors establishes that the government had a significant interest in the use of force against Robert. This interest is sufficient to justify the use of intermediate force against Robert through the use of the taser in dart mode one time. The Court therefore concludes that the use of force against Robert was not excessive in light of the governmental interests at stake.

Rivera was forced to make a split-second decision during rapidly evolving circumstances, including with an erratic and aggressive individual approaching him on an active freeway at night. While Robert was unarmed, Rivera witnessed him run into traffic and suspected he may have been suicidal due to the nature of the dispatch call. Robert refused Rivera's commands, aggressed Rivera on an active freeway, and advanced toward Rivera despite a clear warning. Robert's behavior objectively amounted to an immediate threat to the safety of Rivera and to the public. Consequently, the objective facts, even when viewed in the light most favorable to Plaintiffs, reveal the use of the taser was justified in these circumstances.

### ii.    Whether the law was Clearly Established

Because the Court concludes there was no constitutional violation in Rivera's use of force, Rivera is entitled to qualified immunity. Even assuming the conduct at issue violated Robert's constitution rights, the Court further finds that it cannot be said that Rivera was on notice that the right was clearly established.

**MEMORANDUM DECISION AND ORDER - 34**

Rivera asserts that both claims are barred by the theory of qualified immunity because "[n]o court has ruled that a single taser burst against a subject who, having taken a fighting stance, has aggressed an officer with the apparent intent to fight is unconstitutional under the Fourth and Fourteenth Amendments." (Dkt. 28-2 at 19–20). The Court agrees. Plaintiffs have identified no caselaw to effectively put Rivera or another reasonable officer in his position "on notice" that his use of the taser under these circumstances was unreasonable. At the time of the incidents in question, it was not clearly established that an officer could not use a taser on an aggressing subject while standing on an active freeway. Accordingly, the Court finds that summary judgment is appropriate.[10]

## B.      The Fourteenth Amendment Claims

Rivera argues the Fourteenth Amendment claims for loss of society fail because these claims are derivative of the Fourth Amendment excessive force claim. Alternatively, Rivera contents that his actions do not satisfy the "purpose to harm" standard required to "shock the conscience" to establish a violation of the Fourteenth Amendment for the claims to stand alone. (Dkt. 28-2).

The Ninth Circuit has determined that state interference with a child's protected liberty interest is a substantive due process violation where the interference is not legitimate, including where the interference is "the use of excessive force by police

---

[10] Plaintiff argues that the doctrine of qualified immunity is "flawed – foundationally – from its inception" and should not be applied here. (Dkt. 35 at 21). This Court is bound by the Ninth Circuit's precedent and the precedent of the U.S. Supreme Court. Under those authorities, qualified immunity under Section 1983 is the law of the land, and this Court is bound to treat it as such.

officers." *Fontana*, 818 F.2d at 1419–20. The Court in *Fontana* reasoned that "the same allegation of excessive force giving rise to [the plaintiff's] substantive due process claim based on his loss of life also gives the children a substantive due process claim based on their loss of his companionship." *Id.* Accordingly, because the Court has determined that the underlying Fourth Amendment excessive force claim fails, so too must Plaintiffs' derivative Fourteenth Amendment claims.

Alternatively, the Court further finds that no reasonable juror could conclude Rivera acted with the purpose to harm as required to establish a violation under these circumstances. Official conduct that "shocks the conscience" in depriving a parent or child of their protected interest in the society and companionship of the decedent is cognizable as a violation of due process under the Fourteenth Amendment. *Jones*, at 1132–33. "In cases like this, where officers must react quickly to a rapidly changing situation, the test is whether the officers acted with a purpose of causing harm unconnected to any legitimate law enforcement objective." *Id.* (citing *Porter* v. *Osborn*, 546 F.3d 1131, 1137, 1140 (9th Cir. 2008)). As the Court in *Porter* explained, the "critical consideration is whether the circumstances are such that actual deliberation is practical." *Porter*, 546 F.3d at 1137 (cleaned up). The Court emphasized that in rapidly evolving situations, officers are faced with split-second decisions necessitating fast action and presenting competing obligations. *Id.* at 1139. On the other hand, "[w]here actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience." *Torres,* 610 F.3d at 554.

Plaintiffs argue Rivera is liable under the lower deliberate indifference standard, through a theory of state-created danger. *See Guy v. Lorenzen*, 547 F.Supp.3d 927, 940 (9th Cir. 2021) ("The second prong of the state-created danger claim requires Plaintiff to allege facts showing that [the officer Defendants] acted with deliberate indifference to a known or obvious danger.") (cleaned up). To that end, Plaintiffs focus on Rivera's conduct *after* the use of force, arguing his use of his flashlight, his position on the road, the location of the patrol vehicle, and his failure to set up cones or wear a high visibility vest effectively "funneled traffic" toward Robert, causing his death. This has nothing to do with the events leading up to the use of force here – the taser. Nonetheless, due to the rapidly escalating nature of the approximately two-minute encounter between Rivera and Robert, as detailed at length herein, the Court finds Rivera did not have an opportunity to deliberate, and the purpose to harm standard controls. *Porter*, 546 F.3d at 1137.

Under the purpose to harm standard, a police officer has violated substantive due process only if the officer "acted with the purpose to harm a civilian" for reasons "unrelated to the legitimate law enforcement objectives of arrest, self-defense, or the defense of others." *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 454 (9th Cir. 2013). Here, construing the facts in the light most favorable to Plaintiff, there is no evidence that Rivera acted with the purpose of harming Robert that was unconnected to a legitimate law enforcement objective. As detailed herein, Rivera's use of force was justified by the legitimate law enforcement objective of self-defense and did not amount to excessive force. Rivera's conduct thereafter – waving his flashlight at oncoming vehicles and yelling for Robert to get up – does not establish an intention to harm Robert necessary to

MEMORANDUM DECISION AND ORDER - 37

constitute a violation of due process. Further, to the extent that Plaintiffs attempt to argue that Rivera intentionally funneled vehicles over Robert, that inference is not supported by the record. The Court may determine what objectively reasonable inferences may be drawn from the facts as a matter of logic and law. *Heiman*, 672 F.3d at 1131 n.2. Doing so here, the Court finds there is no evidence that Rivera intended to direct traffic over Robert, particularly to harm him. Indeed, Rivera's statements and the undisputed audio recording of the encounter contradict such an inference, indicating that Rivera tried to prevent Robert from being hit by a vehicle during a rapidly evolving and dangerous situation. Accordingly, the Court grants Defendant's Motion for Summary Judgment as to the Fourteenth Amendment Claims.

### 3.      Motion to Strike

Rivera moves to strike portions of Plaintiffs' Response to the Motion for Summary Judgment, particularly portions of the Forensic Neuropsychological Evaluation of Melinda Jorgensen and letter from Jorgensen to Plaintiffs' counsel rebutting Defendant's toxicologist expert opinion, as irrelevant and inadmissible hearsay. (Dkt. 38-1).

Motions to strike are disfavored at summary judgment, as the Rule itself contemplates objections to materials cited to support or dispute a fact. Fed. R. Civ. P. 56(c)(2). Accordingly, to object to evidence at summary judgment "[t]here is no need to make a separate motion to strike." Fed. R Civ. P. 56 advisory committee's note to 2010 amendment. Motions to strike are limited to pleadings which are defined by Federal Rule 7(a). *See Albertson v. Fremont County, Idaho*, 834 F.Supp.2d 1117, 1123 n.3 (D. Idaho 2011). Thus, the Motion to Strike filed in this case will be construed as evidentiary

**MEMORANDUM DECISION AND ORDER - 38**

objections pursuant to Rule 56(c)(2). In the context of a summary judgment, a district court must "rule on evidentiary objections that are material to its ruling." *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010). "An evidentiary objection is material to the district court's ruling if the court considered the evidence that was the subject of the objection." *Roberts v. Albertson's LLC*, 464 F.App'x 605, 606 (9th Cir. 2011). A court does not need to rule on objections that are not material to the court's ruling on summary judgment. *Id.* at 606–07.

The materials Rivera objects to here are relevant to the issue of the Sequints children's Fourteenth Amendment standing and to the issue of Robert's state of mind. As to standing, the Court need not consider the contested information to conclude the children have standing. Similarly, the Court need not reach the issue of Robert's state of mind because it does not reach the issue of causation for the reasons discussed previously. Further, because the Court finds that no reasonable factfinder could conclude that Rivera's actions were unreasonable given the totality of the circumstances, the Court need not consider Dr. Jorgensen's opinion. Thus, the evidentiary objections thereto are not material, and the Court need not address them. Accordingly, Rivera's objections are overruled, and the Motion to Strike is denied.

### CONCLUSION

The Court is sympathetic to the undoubtedly tragic circumstances presented in this case. Nonetheless, in accordance with the above authorities and analysis, Rivera's Motion for Summary Judgment will be granted. Further, because the Court need not rely on the

evidence to which Rivera objects in order to reach this conclusion, Rivera's Motion to Strike is denied.

## ORDER

THEREFORE, IT IS HEREBY ORDERED Defendant's Motion for Summary Judgment (Dkt. 28) is **GRANTED**.  IT IS FURTHER ORDERED that that Defendant's Motion to Strike (Dkt. 38) is **DENIED**.

DATED: August 10, 2026

Honorable Debora K. Grasham
United States Magistrate Judge